TELEVATION TELECOMMUNICATION SYSTEMS, INC., Plaintiff-Appellee, v. WILLIAM SAINDON *et al.*, Defendants-Appellants.

Second District   No. 2—87—0953

Opinion filed April 28, 1988.

Zachary M. Bravos, of Bravos & Trapp, Ltd., of Wheaton (William W. Rath, of counsel), for appellants.

Lehrer, Flaherty & Canavan, of Wheaton (R. Lawrence Canavan, of counsel), for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiff, Television Telecommunication Systems, Inc. (Television), filed suit against William Saindon, Timothy Rex, and Digital Systems Research, Inc., for the misappropriation and use of its trade secrets. The complaint, filed on April 2, 1987, was in three counts and sought injunctive relief, damages, and an accounting. The trial court expedited trial on the claim for injunctive relief and, on September 9, 1987, entered an injunction prohibiting the defendants from manufacturing or selling their product or otherwise using or disclosing plaintiff's trade secrets for a period of three years. Defendants have taken an interlocutory appeal from that order.

John Regan and Robert Groetzenbach established Television in 1978 to develop an electronic product which could add features to an existing in-house phone system (PBX) without having to replace the PBX. Television developed its first product, the PEP 100, over a period of about two years. The PEP 100 is "an automatic wake-up system," designed primarily for hotels and motels. The system's primary function, although it has others, is to automatically place recorded wake-up calls over the hotel's PBX system, at designated times, to up to three rooms simultaneously. Television's second product, the Reveille, is a less expensive automatic wake-up system that can place simultaneous calls on two lines. The Reveille took about one year to develop and was first marketed in late 1982. Television's Echodyne system is a recorded announcement system that can answer up to 192

incoming calls simultaneously with a recorded message. It can also be programmed to deliver different announcements on different groups of lines. The Echodyne system is much larger than the PEP 100 and Reveille systems, but it contains circuitry that was originally designed for those products. The first Echodyne system was sold in late 1983.

Each of Television's products contains two distinct types of electronic circuitry—analog and digital. Both types of circuitry are necessary to allow an electronic product to perform the functions which Television's products perform. Television's analog circuitry, which is the subject of this dispute, was designed exclusively by John Regan.

William Saindon worked as Television's production and quality control manager from March 1983 until April 1984 and had complete access, during that time, to the schematics, or blueprints, of Television's electronic circuitry. In October 1984, Saindon collaborated with Timothy Rex and Janusz Dobrowolski to establish Digital Systems Research, Inc. (Digital). From October 1984 until April 1987, when this suit was filed, Digital developed its own automatic wake-up system, the Prelude, to compete with Television's systems. Prelude's analog circuitry, which Saindon claims to have designed, is virtually identical to analog circuitry designed by Regan and contained in some or all of Television's products. The only differences between the two are attributable to changes made to Television's circuitry after Saindon's employment terminated. Prelude's digital circuitry, which was designed by Dobrowolski, is substantially different from Television's digital circuitry and even allows the Prelude to perform some functions which Television's machines do not perform.

Regan and Groetzenbach first became aware of the Prelude machine early in 1987, when they were contacted by one of their suppliers, Magnetic Components, Inc. (Magnetic), which informed them that Digital had attempted to order a transformer specially designed by Regan and manufactured by Magnetic only for Television. Television then ordered a Prelude machine through a third party, examined its circuitry, and filed this action. The Prelude unit ordered by Television was the first, and only, unit Digital sold.

After a complete evidentiary hearing on plaintiff's claim for injunctive relief, the trial court concluded that Television's schematics of its analog circuitry and the manner in which its analog circuitry interfaces with its digital circuitry are trade secrets. It concluded that defendants misappropriated those secrets from plaintiff and incorporated them into their own product. It entered a "preliminary and permanent injunction" prohibiting defendants, for a period of three years, from: (1) manufacturing, marketing, constructing, or selling the

Prelude or any similar product which incorporates plaintiff's trade secrets; (2) using any of the analog circuitry depicted in the exhibits (some of which the court itemized by name); and (3) selling, transferring, or disclosing plaintiff's trade secrets. The order also affirmatively required defendants to return any of Television's schematics or copies of them in its possession, as well as any component parts taken from Television.

Defendants argue that the trial court erred in finding Television's schematics to be trade secrets. They claim that the information which Saindon remembered and incorporated into Prelude was simply knowledge he gained in the course of his employment with Television, which he was entitled to use. They contend that Television's schematics do not qualify as trade secrets, because their confidentiality was not adequately protected, and because the circuitry is well known in the trade.

■■ Illinois courts will afford injunctive relief to a plaintiff-employer against a former employee only if the plaintiff can demonstrate that it has a protectable business interest. (*Hayden's Sport Center, Inc. v. Johnson* (1982), 109 Ill. App. 3d 1140, 1146; *Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 355.) An employer has a recognized business interest in protecting trade secrets disclosed in confidence to the employee during the course of his employment (see, *e.g.*, *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 386-87; *Victor Chemical Works v. Iliff* (1921), 299 Ill. 532, 546-48), even where, as here, there is no enforceable restrictive covenant between the parties. (*Smith Oil Corp. v. Viking Chemical Co.* (1984), 127 Ill. App. 3d 423, 427.) The plaintiff must establish that the information was a trade secret affording it a competitive advantage, that it was disclosed to the employee in confidence, and that it would be unjust under the circumstances to permit the employee to disclose or use the information. (*Victor Chemical Works v. Iliff*, 299 Ill. at 548.) The courts recognize that conflicting social and economic concerns must be accommodated in delineating the protection afforded to alleged trade secrets. On one hand, the court should protect the employer's investment of time, money and manpower in developing secret advantages from misappropriation by former employees who occupied a position of trust. On the other hand, the court must recognize that in a mobile society based on competition, the individual has a fundamental right to pursue the occupation for which he is best suited and to make use of the knowledge and skills he has acquired through experience. *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 93-94; see also *Brunswick Corp. v. Outboard Marine Corp.* (1980), 79

Ill. 2d 475, 478 (identifying as an additional concern the public interest in the free use of ideas and goods not protected by a valid patent).

■■ ■ A trade secret is generally defined as "a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such limited other persons to whom it may be necessary to confide it." (*ILG Industries, Inc. v. Scott*, 49 Ill. 2d at 92; *Hayden's Sport Center, Inc. v. Johnson*, 109 Ill. App. 3d at 1146.) The definition is necessarily inexact, because a wide variety of things, depending upon the particular circumstances involved, may qualify as trade secrets. (*ILG Industries, Inc. v. Scott*, 49 Ill. 2d at 92.) The supreme court has identified six factors to be considered in determining whether information or materials constitute trade secrets: (1) the extent to which the information is known outside the employer's business; (2) the extent to which it is known to employees and others involved in the employer's business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and its competitors; (5) the money or effort expended by the employer in developing the information; and (6) the ease or difficulty with which others might properly acquire or duplicate the information. *ILG Industries, Inc. v. Scott*, 49 Ill. 2d at 93, citing Restatement of Torts, §757 comment *b*, at 4-5 (1939).

Saindon's testimony describing the manner in which he designed Prelude's analog circuitry is confusing and contradictory. He produced a number of textbooks and manufacturers' data sheets which he claimed to have relied upon. However, he also admitted that, seven months after he left Televation, he drew from memory a number of schematics that are virtually identical to Televation's analog circuitry schematics. He admitted that in designing Prelude's circuitry he used and incorporated everything he could remember (and thought would be useful) about Televation's designs. He claimed that he inadvertently memorized the information from constant exposure to Televation's schematics. As examples of the detail with which Saindon recalled Televation's schematics, we note that his schematics duplicate the precise numerical values assigned by Regan to each of the electronic components in the circuits (which apparently must all be compatible for the unit to function) and that he recalled the nine-digit part number assigned by one of Televation's suppliers to Regan's custom-designed transformer. He could not recall the number at trial, however. Defendants argue that this information was general knowledge acquired by Saindon in his experience at Televation which he could not erase from his memory.

■■ ■ It is irrelevant as a matter of law, however, whether Saindon took copies of Television's schematics or memorized them in detail, because an employee "may not take with him confidential particularized plans or processes developed by his employer and disclosed to him while the employer-employee relationship exists, which are unknown to others in the industry and which give the employer advantage over his competitors." (*Schulenburg v. Signatrol, Inc.*, 33 Ill. 2d at 387.) A former employee's use of his employer's proprietary data cannot be deemed a legitimate application of acquired expertise. (*Affiliated Hospital Products, Inc. v. Baldwin* (1978), 57 Ill. App. 3d 800, 807, *aff'd* (1979), 79 Ill. App. 3d 74.) The record amply supports the trial court's conclusion that Saindon deliberately misappropriated the information contained in Television's schematics. It also supports the trial court's apparent conclusion that Saindon, in fact, physically took copies of Television's schematics and/or some of its component parts.

We must next determine whether the information Saindon took qualified as trade secret information. We note that our review of the expert testimony was significantly hampered by the fact that, in order to protect their confidentiality, the exhibits have not been included in the record. The discussion which follows is therefore limited to the general conclusions reached by the experts.

George Thomas, an expert in electrical engineering, testified for plaintiff. Thomas stated that Television's analog circuitry was intricate, custom-designed circuitry. While most of the component parts are readily available in the industry, Television's approach in arranging, interfacing, and refining the components has rendered its design entirely unique. Thomas stated that another engineer could not duplicate Television's circuits exactly, as Digital had done, unless he had had access to the schematics or "reverse engineered" Television's end products by disassembling them and tracing their circuitry. He testified specifically with respect to the analog circuitry illustrated in plaintiff's group exhibit No. 5. Exhibit No. 5 apparently did not contain all of the disputed analog circuits, however. Thomas stated that it would take someone with his engineering experience one to two years to reverse engineer the circuits shown in the exhibit, and that Regan's custom transformer, which is necessary to those circuits, could not be reverse engineered at all. Thomas estimated that, for someone with less experience than he had, it would take two years to forever to reverse engineer those circuits. He stated that the process of reverse engineering electronic equipment is tedious and prone to error and that most engineers would probably elect instead to determine

what functions the circuits perform and design their own, comparable circuits to perform the same tasks. He stated that specification sheets, like those for Televation's custom transformer, are routinely provided in the electronics industry to component manufacturers, like Magnetic. The manufacturers then produce the components to the designer's specifications. They treat the specification sheets as confidential and will not supply the parts to other customers without the designer's knowledge and approval.

On cross-examination, Thomas stated that he had seen other, standard transformers that would perform the same function as Regan's custom transformer, but which were larger. He stated that Televation's designs would not necessarily offer an advantage over comparable circuits designed to perform the same functions. He also estimated that it would take him 9 to 13 months to independently design the circuits contained in exhibit No. 5 or to design comparable circuits.

Howard Jirka, defendants' expert in electrical engineering, testified that, in his opinion, plaintiff's analog circuits were not novel and that they consisted of standard components. He believed they could be designed by using standard references. He concluded that Televation's custom transformer was a simple one, which would have been easy to design and construct. The court sustained plaintiff's objection when defendants' counsel asked Jirka whether the transformer could be reverse engineered. The court allowed defendants to make an offer of proof, however, that it was Jirka's opinion that it could be. Jirka estimated that one of plaintiff's analog circuits would take approximately two weeks to independently design. He did not offer an estimate, however, as to how long it would take an engineer to independently design or reverse engineer all of the analog circuits.

It is undisputed that Televation kept its schematics in an unlocked file cabinet in an employee work area of its office. Televation did not require its employees to sign nondisclosure agreements and did not keep a record of the number of copies made of each schematic. The office was always locked when the employees were not present. Regan and Groetzenbach testified that they sometimes provided component manufacturers with specification sheets describing requirements for component parts but never with detailed schematics of their circuit boards. They stated that they sometimes gave draftsmen portions of schematics from which to make layouts but never permitted them to see the schematics for an entire system. They testified that Televation had only three employees and that Regan always informed new employees of Televation's policy that no schematics (ex-

cept those portions provided to draftsmen) were to leave the building. Any portions of schematics or any specification sheets which were given to draftsmen or manufacturers were stamped with Television's name and the word "proprietary."

Regan testified that he informed Saindon of Television's security policies when Saindon worked there and that he delegated to Saindon the authority for organizing the schematics. He stated that he gave Saindon the company's proprietary stamp and instructed him to use it to mark any documents that had to leave the building. Saindon denied that he was given the stamp or informed of any policies concerning the schematics but admitted that he knew the materials were confidential. He also admitted that he understood that he could not remove them except in the course of his work and that they were not to be shown to outsiders.

■ On this record, we conclude that the trial court's finding that Television's schematics and circuitry were trade secrets is not against the manifest weight of the evidence. Regan spent approximately five years designing, developing, and modifying the analog circuitry necessary to Television's products. We believe the testimony strongly supports the conclusion that the circuitry was not readily available or known outside Television. While the component parts were available, the testimony demonstrated that standard references and manufacturers' data sheets would not show a designer how to use the parts in the combinations and with the assigned values that Television used. And while Thomas testified that Television's designs would not necessarily be better than comparable circuitry which other engineers might create, Television had the obvious advantage of completed, functional, and marketable circuitry which a legitimate new competitor would have to spend nine months to two years, by Thomas' estimates, to develop or copy. See, *e.g.*, *Affiliated Hospital Products, Inc. v. Baldwin*, 57 Ill. App. 3d at 807.

■ It is true that a design or process that can easily be ascertained from an examination of the product itself cannot be a trade secret. (See *Filter Dynamics International, Inc. v. Astron Battery, Inc.* (1974), 19 Ill. App. 3d 299, 317; *Bimba Manufacturing Co. v. Starz Cylinder Co.* (1969), 119 Ill. App. 2d 251, 265.) The mere fact, however, that a competitor could, through reverse engineering, duplicate plaintiff's product does not preclude a finding that plaintiff's techniques or schematics were trade secrets, particularly where, as here, the evidence demonstrated that the reverse engineering process would be time-consuming. (*ILG Industries, Inc. v. Scott*, 49 Ill. 2d at 94; *Schulenburg v. Signatrol, Inc.*, 33 Ill. 2d at 385-87.) Nor is the

finding that a trade secret exists precluded by the fact that other approaches may accomplish the same result. (*Victor Chemical Works v. Iliff*, 299 Ill. at 546.) It is therefore no defense to claim that one's product could have been developed independently of plaintiff's, if in fact it was developed by using plaintiff's proprietary designs. (*Affiliated Hospital Products, Inc. v. Baldwin*, 57 Ill. App. 3d at 807.) The evidence therefore adequately supports the conclusions that Television's schematics were unique and valuable and that they could not easily be duplicated.

In addition, partial disclosure of the information to third parties, where disclosure is necessary, does not preclude a finding that the information constitutes a trade secret. In *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 94, the supreme court held that plaintiff's partial disclosure of its industrial drawings to customers and manufacturers, who understood them to be confidential, did not destroy their secrecy. In fact, in *ILG*, as here, it was one of plaintiff's suppliers, to whom a partial disclosure had been made, that informed plaintiff of the defendant's apparent use of its confidential designs. 49 Ill. 2d at 94.

While Television did not use stringent security measures in its offices, we note that its complete schematics were available only to its few employees, who had to use the schematics to do their jobs. Television therefore disclosed the information only to persons to whom it was necessary to disclose it. In addition, the employees were informed that the schematics were confidential and were not to be taken out of Television's offices. Defendants' reliance on *Junkunc v. S. J. Advanced Technology & Manufacturing Corp.* (1986), 149 Ill. App. 3d 114, is misplaced. In *Junkunc*, the court found plaintiff's security measures, which were admittedly more stringent than Television's security measures here, inadequate to protect information plaintiff claimed to be a trade secret. (149 Ill. App. 3d at 119.) The defendant in *Junkunc*, however, was not only a former employee of the plaintiff corporation, but the son of the principal developer of plaintiff's secret process. (149 Ill. App. 3d at 120.) His knowledge of plaintiff's business, therefore, was not acquired solely through an employer-employee relationship, and the court concluded that, under the circumstances, the plaintiff had to demonstrate some kind of confidential agreement with the defendant in order to warrant an injunction. (149 Ill. App. 3d at 120.) Here, Saindon's knowledge of Television's circuitry, and, in fact, of automatic wake-up machines in general, resulted exclusively from his employment at Television. We therefore agree with the conclusion of the trial court that Television's analog

circuitry schematics constituted protectable trade secrets.

■ Defendant next contends that the record does not support the court's imposition of a three-year injunction. In *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, the supreme court held that a trial court should not enjoin a defendant's reproduction of plaintiff's product, notwithstanding defendant's reliance on misappropriated trade secrets, "for a period of time longer than that required to duplicate the product by lawful means." (33 Ill. 2d at 388; see also *ILG*, 49 Ill. 2d at 96.) The court recently explained that ruling in *Brunswick Corp. v. Outboard Marine Corp.* (1980), 79 Ill. 2d 475, 479-80, where it stated:

> "By enjoining the use of wrongfully acquired trade secrets for the approximate length of time it would require a legitimate competitor to develop a competitive product following a lawful disclosure of the information, the wrongdoer is deprived of any advantage from his wrongdoing, the developer of the trade secret is placed in the same position it would have occupied if the breach of confidence had not occurred, and the minimum restraint *** would be placed upon competitors and the utilization of the competitors' and the employees' skills."

Thomas, plaintiff's expert, estimated that it would take someone with his experience one to two years to reverse engineer certain of Television's analog circuits. While he stated that he did not believe Television's transformer could be reverse engineered, he also stated that other transformers were available which could perform the same function. In addition, he stated that an engineer could independently design or create comparable circuitry to perform the necessary tasks, apparently using plaintiff's circuitry to determine what functions the end product must be capable of performing. His estimate with respect to the circuits discussed above was that it would take him approximately 9 to 13 months to independently design them. We believe we must disregard Thomas' vague and open-ended estimate that it would take someone with less experience than himself two years to forever to reverse engineer the circuitry. We believe the sounder approach is to assume that the "legitimate competitor" identified in *Brunswick* (79 Ill. 2d at 479) is competent in his particular field. In summary, then, the expert testimony indicated that it would take a skilled competitor using some lawful method of reproduction nine months to two years to duplicate less than all of Television's analog circuitry.

■ The testimony established that it took Regan and Groetzenbach approximately five years to develop their products and that the circuitry of each product incorporated, modified and improved the cir-

cuitry in the products which preceded it. In addition, each existing product was regularly improved and modified as the newer products were developed. We recognize that these products include digital, as well as analog, circuits and that Prelude's digital circuitry was independently developed. However, the appropriate injunction period should be the time required to legally produce a competing *product* (see *Brunswick Corp. v. Outboard Marine Corp.*, 79 Ill. 2d at 479-80; *Schulenburg v. Signatrol, Inc.*, 33 Ill. 2d at 388), not merely the disputed portions of a product. It is clear that the analog circuitry misappropriated from Television is an integral and indispensible portion of the Prelude machine. The evidence established that certain analog circuits alone would take nine months to two years to copy or independently develop and that the completed products or a composite of them, as the Prelude apparently is, could take up to five years to develop. Based on this testimony, we cannot conclude that the trial court's imposition of a three-year injunction was against the manifest weight of the evidence.

While defendants assert that they have already spent over two years (although they worked only part-time on the project) developing the Prelude since Saindon's misappropriation of Television's trade secrets, we note that the evidence would have supported an injunction of up to five years for the duplication of an entire composite product. It therefore appears that the trial court may have reduced the injunction period to allow for the approximate amount of legitimate independent development time defendants have invested in the Prelude. Moreover, this time has not been lost to defendants as the injunction does not prohibit their use of the digital circuitry they developed in conjunction with any analog circuitry they *independently* develop in the future. We therefore affirm the three-year injunction period.

Defendants' final contention is that the injunction order is not sufficiently specific to meet the requirements of section 11—101 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 11—101). Defendants claim that the order is indefinite in that it does not adequately identify the designs or schematics which constitute plaintiff's trade secrets and then enjoins them from manufacturing or selling Prelude or any product similar to it "based on or incorporating plaintiff's trade secrets." In addition, defendants complain that the order prohibits their use of circuits contained in the textbooks and manufacturers' application notes, which they produced in evidence, by prohibiting their use of "any of the analog circuitry as set forth on the exhibits in this cause."

■■ ■ An injunctive order should be as precise and definite as

possible to avoid creating misunderstandings or excuses for disobeying its terms. (*In re Marriage of Grauer* (1985), 133 Ill. App. 3d 1019, 1026.) Considering the technical nature of its subject matter, we find the trial court's order sufficiently precise to meet that standard. The court's oral injunction order, from which the written order was drafted, clearly affords trade secret protection only to plaintiff's schematics of its analog circuitry and of the circuitry which interfaces its analog circuitry to its digital circuitry. (*Cf. In re Marriage of Grauer*, 133 Ill. App. 3d at 1026 (concluding that where the court orally informs the party of its reasons for issuing an injunction, the order itself need not restate those reasons).) The portion of the order prohibiting defendants from using or incorporating plaintiff's trade secrets is therefore plainly limited to the use of plaintiff's analog and interfacing circuitry. The order therefore in no way purports to enjoin defendants from purchasing or using standard electronic components. With respect to the portion of the order enjoining the sale of products "based on" plaintiff's trade secrets, we note that, in *ILG*, the supreme court upheld a similarly worded injunction prohibiting the defendants from selling "any fan or any component thereof which was built on information derived from any of the plaintiff's fans depicted in the two drawings." (*ILG Industries, Inc. v. Scott*, 49 Ill. 2d at 95.) The *ILG* court concluded that it would have been of no practical benefit to the plaintiff if the court had imposed a less restrictive injunction prohibiting only the sale of those fans which the defendant admitted were constructed solely from the information contained in plaintiff's drawings. (49 Ill. 2d at 95.) We conclude that the injunction adequately defined both the specific rights it protected and the particular conduct it prohibited. (See *Village of Gilberts v. Holiday Park Corp.* (1986), 150 Ill. App. 3d 932, 936-37.) We therefore conclude that it is not defective.

For the reasons stated, the judgment of the circuit court is affirmed.

Affirmed.

DUNN and WOODWARD, JJ., concur.