**HEXACOMB CORPORATION, Plaintiff,**

v.

**GTW ENTERPRISES, INC., and George T. Wroblewski, Sr., Defendants.**

No. 93 C 3107.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 28, 1993.

Arne M. Olson, Michael A. Hierl, Daniel J. Deneufbourg, Olson & Hierl, Ltd., Chicago, IL, for plaintiff.

Gerald Nora, Frank, Miller, Melamed, Tabis & McDonnell, P.C., Chicago, IL, for defendants.

## PRELIMINARY INJUNCTION ORDER

ANDERSEN, District Judge.

This matter has come for hearing before the Court, Honorable Wayne R. Andersen, District Judge, presiding, upon the motion of Plaintiff, Hexacomb Corporation, for a Preliminary Injunction. In its motion and supporting and related memoranda, Hexacomb complained that the Defendants GTW Enterprises, Inc. ("GTW") and George T. Wroblewski, Sr. ("George Sr."), misappropriated Hexacomb's trade secrets in Hexacomb's continuous-feed CHS machines and breached their fiduciary obligations to Hexacomb. Further, Hexacomb contends that unless a preliminary injunction issues, it will suffer permanent and irreparable damage for which it has no adequate remedy at law. The following order constitutes this Court's findings of facts and conclusions of law pursuant to Rule 52(b) of the Federal Rules of Civil Procedure and this Court's reasons pursuant to Rule 65 of the Federal Rules of Civil Procedure. The Court held a hearing from July 26, 1993 to August 12, 1993 and heard the testimony of ten witnesses and reviewed the submissions and exhibits of the parties. The Court also considered the supplemental submissions and deposition of George Sr. taken after his employment agreements were located as a result of a diligent search. The issues having been duly heard and a decision having been duly rendered, the Court makes the following findings of fact and conclusions of law:

### I. FACTUAL BACKGROUND

Hexacomb Corporation and its predecessors in interest (collectively referred to as "Hexacomb") have been engaged in the design, manufacture and sale of honeycomb paper products for use in packaging, material handling, and structural applications. One of the honeycomb packaging products manufac-

tured by Hexacomb is a double-faced sandwich panel made of a paper honeycomb core and upper and lower facing sheets. (Hearing, pp. 17–20). The paper honeycomb core is made on a continuous-feed CHS machine designed and manufactured by Hexacomb which allows for the uninterrupted production of a continuous sheet of core material. (Hearing, pp. 28–30).

The continuous-feed CHS machine is a large and complicated machine which is seventy to eighty feet long, about twelve feet tall, and ten feet across. It uses six rolls of paper that are five feet long and about three feet in diameter. (Hearing, p. 32). The only part known to the public and to customers of Hexacomb, the finished product, gives no clue as to how the CHS machine is designed or works. (Hearing, pp. 85–90).

The Defendants have not shown that any other party has a continuous-feed CHS machine. The various features of Hexacomb's CHS machine allow Hexacomb to produce core material at a rate at least five times faster than any existing machines and twice as fast as the proposed modernized machine which Mr. Burgess, one of Defendants' witnesses, said he was prepared to manufacture. The resulting core, being continuous, avoids the problems of non-continuous core such as sold by some of Hexacomb's competitors. (Hearing, pp. 30–31). Hexacomb has expended at least approximately $4 million and over ten years to design, engineer and manufacture its CHS machines. (Hearing, pp. 164, 218). Each Hexacomb CHS machine produces about 7 to 8 million dollars of core per year. (Hearing, p. 205).

From 1972 to May 7, 1992, George T.W. Wroblewski, Sr. ("George Sr.") was employed by Hexacomb and its predecessor companies. In 1972, George Sr. joined Celadyn Corporation ("Celadyn"), formerly Lancaster Research & Development Corporation ("Lancaster"), as a maintenance supervisor at its Michigan City, Indiana plant. At the time George Sr. joined Lancaster, it had already been purchased by Bell Fibre Products Corporation ("Bell Fibre") and its name was being changed from Lancaster to Celadyn Corporation. (Wroblewski Dep., pp. 134–135, Exh. 135; Luera Decl., ¶ 4).

The Court finds that Exhibit QQ is the Employee Confidential Information and Invention Agreement signed by George Sr. on July 24, 1972 with Lancaster Research and Development. George Sr. admitted that the signature on the employment application and Exhibit QQ "looks like" his signature and that he has no reason to believe that the signature is not his. He also said that the date, July 21, 1972, is about the time he started working for Lancaster/Celadyn. (Wroblewski Dep., pp. 246–249, 256). The date is the same on the letter confirming Bell Fibre's offer and George Sr.'s acceptance of employment. (Wroblewski Dep., Exh. 135). Because Exhibit QQ was signed at the same time as George Sr. began his employment, there is no question of adequate consideration. In exchange for signing, George Sr. was given the job.

In September 1976, Bell sold Lancaster/Celadyn to Hexcel and the Michigan City plant was then run by Hexcel. George Sr. "had the same job" as maintenance supervisor and the same responsibilities as he had with Lancaster/Celadyn. In fact, George Sr. does not remember any change in his job. (Wroblewski Dep., pp. 252, 255, 257, 265–266). George Sr. got the same benefits and kept his seniority as part of the acquisition. (Wroblewski Dep., pp. 265–266). The Court finds that Exhibit SS is the Hexcel employee confidentiality agreement signed by George Sr. on September 1, 1976. The first paragraph of that Agreement specifically states that it applied not only to Hexcel but also "to its successors and assigns ..."

George Sr. again admitted that the signature on Exhibit SS "looks like" his. (Wroblewski Dep., pp. 255–258). The date, September 1, 1976, is the same as that on George Sr.'s Hexcel employment application. (Wroblewski Dep., Exh. 133, Doc. No. 100389). Thus, there was adequate consideration because George Sr. continued his employment with Hexcel for three and a half years.

On February 12, 1979, the paper honeycomb business of Hexcel in Michigan City was bought by Hexacomb. (Exhibit TT, Walmsley Dec., ¶ 4). Exhibit RR is a reaffir-

mation of the employee confidentiality agreement signed by George Sr. on February 27, 1979. George Sr. also testified that the signature on the original agreement "looks like" his and that there is no reason to believe that the signature is not his. (Wroblewski Dep., p. 267). This reaffirmation, which also by its own terms applies to "Hexcel or its successors or assigns," was signed by George Sr. with knowledge that he was going to be working for Hexacomb. This can be seen from the International Honeycomb Corporation insurance application which George Sr. filled out on February 27, 1979 (Wroblewski Dep., Exh. 136) and the meeting held prior to the acquisition where the Hexcel employees were notified of the sale and that Hexacomb would welcome all of the Hexcel employees. (Wroblewski Dep., pp. 275–276; Luera Decl., ¶ 12).

George Sr. kept the same job with the same responsibilities as he had with Hexcel. (Wroblewski Dep., pp. 261, 268–269). George Sr. did not even fill out an employment application with Hexacomb and in his words: "I think it just automatically became the same job." (Wroblewski Dep., p. 269). He again kept his seniority after the acquisition. (Wroblewski Dep., p. 267). Once again, the whole plant was acquired and everyone kept their jobs—only the paychecks came from a different source. (Wroblewski Dep., p. 259).

After Hexacomb acquired the Michigan City plant, George Sr. began work on improving the CHS machines for Hexacomb. (Wroblewski Dep., pp. 270–274). In February 1982, Hexacomb's Michigan City plant was closed and its operations consolidated into Hexacomb's existing operations at its University Park, Illinois plant. All of the Michigan City employees including George Sr. were offered positions at University Park. (Wroblewski Dep., p. 277). George Sr., however, did not at first accept the offer of employment because he did not want to make the long trip to University Park. (Wroblewski Decl., p. 276).

George Sr. returned to Hexacomb in December 1982, eight months later. George Sr. again had the same position of maintenance supervisor including the same duties and responsibilities. (Wroblewski Dep., pp. 278–279). This Court finds that George Sr.'s substantially continuous employment by Hexacomb and its predecessors-in-interest entitle Hexacomb to enforce the employment agreements of Exhibits QQ, RR, and SS against George Sr.

In December, 1992, International Honeycomb, as it was then known, changed its name to Hexacomb Corporation, the named Plaintiff. Prior to his employment with Hexacomb and its predecessors in interest, George Sr. had no knowledge or experience with honeycomb paper products or the machines used to make such products. (TRO Hearing, pp. 78–79; Hearing, p. 361–363).

As the maintenance supervisor and machine builder for Hexacomb, George Sr. was responsible for: (a) ensuring that the machines were kept in working order, (b) repairing the machines if broken, and (c) designing and building various machines including CHS machines. He was the custodian of all the drawings and sketches relating to the design, manufacture and operation of Hexacomb's machines including the CHS machines.

There was evidence of various security measures taken by Hexacomb to keep its CHS machines confidential. These included the employee handbook received by all employees, including George Sr., which outlined Hexacomb's policy regarding visitors and cameras. (Hearing, pp. 350–351; Exhibit J). Hexacomb also sent out memos regarding confidentiality including a May 8, 1991 memo pertaining to the need to maintain product and process confidentiality during plant tours by visitors which George Sr. admitted he received and read. (Exhibits D and E; Hearing pp. 355–357, 660–661). Hexacomb's policy requiring visitors to sign a pass and agree to maintain in confidence all confidential and proprietary information divulged or exposed during the visit was sporadically enforced but did not result in outsiders learning how the CHS machines worked.

Hexacomb also conducts exit interviews with its employees and George Sr. admitted receiving admonitions from William Renick at his own exit interviews in May, 1992 and

later at GTW in January, 1993 that he not build continuous-feed CHS machines like Hexacomb's and that the design of the CHS machines were confidential. (Hearing, pp. 394–395). Hexacomb also requires employees to sign a general release and severance agreement and mails letters to former employees to remind them of their obligation not to use Hexacomb confidential information for their own benefit or for the benefit of others. (Exhibits F and G). The Court also finds that George Sr. signed and witnessed the 1984 Peotone confidentiality agreement which George Sr. admitted he "probably did" read. (Hearing pp. 352–355; Exhibits U and NN). This Court finds that the Peotone agreement is still in force because Hexacomb continues to purchase parts for its CHS machines from Peotone. (Hearing, pp. 647–650; Group Exhibit NN).

As a security measure, a full set of drawings of the CHS machines were not prepared so they could not fall into the wrong hands. (Hearing pp. 109–110). There was evidence also presented by both Manuel Luera and Reuben Carder that they had conversations with George Sr. regarding the confidentiality of Hexacomb's continuous-feed CHS machines and that Mr. Carder testified that George Sr. instructed him to cover up CHS machines so that they could not be seen by visitors. (Hearing, pp. 409, 644–645, 659–662). On occasion, barriers have also been placed around the CHS machines to prevent visitors from viewing them. (Hearing, pp. 644–645, 658–660, and 669).

On April 28, 1992, George Sr. submitted his resignation and on May 5 and 7, 1992, William Renick, Hexacomb's vice president of operations, conducted two exit interviews with George Sr. In the exit interviews, Mr. Renick warned George Sr. that Hexacomb did not want him to manufacture CHS machines for anyone without Hexacomb's explicit authorization since he had learned about the CHS machines while employed by Hexacomb and the CHS machines were proprietary to Hexacomb. George Sr. admits that he received such a warning. (Hearing, pp. 368, 394–395). George Sr. also admitted that he learned all he knows about CHS machines as a result of his employment with Hexa-

comb. (TRO Hearing, pp. 78–79; Hearing, pp. 361–363).

In January, 1993, Mr. Renick and James Siegel of Hexacomb met with George Sr. to again warn him of the confidential nature of the CHS machines and not to make CHS machines. (Hearing, pp. 394–395). Notwithstanding Hexacomb's repeated warnings, the Defendants built a CHS machine which they sold and shipped in May, 1993 to Damage Prevention Products, Inc. ("Damage Prevention"), a company located in California. A second CHS machine was built for American Honeycomb Corporation ("American Honeycomb"). American Honeycomb is a newly formed company which included former Hexacomb employees, Rick Gillette and David McCarthy.

## II. *A PRELIMINARY INJUNCTION IS WARRANTED TO HALT DEFENDANTS' MISAPPROPRIATION OF HEXACOMB'S CHS MACHINE AND TO PROTECT HEXACOMB'S TRADE SECRETS*

This Court has personal jurisdiction over the parties and jurisdiction over this action pursuant to 28 U.S.C. Section 1332(a). Venue is proper in this District. Hexacomb is entitled to a preliminary injunction if it can demonstrate that: 1) there is "some" likelihood of success on the merits; 2) there is no adequate remedy at law and irreparable harm; 3) the balance of hardships weighs in Hexacomb's favor; and 4) issuance of the injunction will serve the public interest. *A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903, 906 (7th Cir.1986).

### A. *Hexacomb Will be Irreparably Harmed if This Injunction Does Not Issue*

■ We find that the sale of CHS machines to competitors or to customers of Hexacomb will radically undermine Hexacomb's sales and profits margins. Although Hexacomb could remedy this by using its superiority in packaging design or by expanding its manufacturing capacity, this would be a difficult undertaking without substantial financial resources available for capital investment. Hexacomb has made a showing that it does not have such resources.

Accordingly, there is likely to be irreparable harm to Hexacomb if a preliminary injunction does not issue. At this time, the Defendants only have an order for a CHS machine but have not yet begun building the machine. Accordingly, the harm to the Defendants is minimal.

## B. Hexacomb Has No Adequate Remedy at Law

■ Hexacomb has made a showing that it obtains as much as two million dollars a year in profit from the CHS machines. Hexacomb's profits from the CHS machines have averaged, after investment four to five hundred thousand dollars per year. GTW's business is a small, family-run business that clearly has inadequate resources to pay damages to compensate Hexacomb for Hexacomb's injuries should Hexacomb prevail in this action. No evidence was presented that would indicate that George Sr. has the personal resources to compensate Hexacomb in monetary damages. Accordingly, Hexacomb does not have any adequate remedy at law.

## C. There Is No Overriding Public Interest

No evidence was presented that would demonstrate that there is an overriding public interest in the availability of CHS honeycomb paper core making machines regardless of their status as a trade secret, and none is found by this Court.

## D. Hexacomb Has Shown That It Is Likely To Succeed On Its Claim Of Misappropriation of Trade Secrets Under the Illinois Trade Secrets Act

The Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* (1992), in pertinent part, defines a trade secret as follows:

"(d) Trade secret means information, including but not limited to, technical or nontechnical data ..., device, ... drawing, ..., that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d).

### 1. Hexacomb's CHS machine is "sufficiently secret" under Section 2(d)(1) of the Illinois Trade Secrets Act.

■ Hexacomb has shown that its CHS machine is sufficiently secret to derive economic value from not being generally known to other persons who can obtain economic value from its disclosure or use. The Defendants by their actions seek to capitalize on that value by building such CHS machines. Hexacomb has shown that the design and features of its CHS machines are not known to anyone outside of Hexacomb except as a result of unauthorized actions by the Defendants. Although Defendants have shown that key elements of the machine design are being used or have been used by other companies, a trade secret can nonetheless exist in a combination of characteristics and components which affords a competitive advantage. *Syntex Ophthalmics, Inc. v. Tsuetaki,* 701 F.2d 677, 684 (7th Cir.1983), citing *Imperial Chemical Industries, Ltd. v. National Distillers & Chemical Corp.,* 342 F.2d 737, 742 (2nd Cir.1965). The Court finds that Hexacomb's continuous-feed CHS machines are such a combination of characteristics and components which affords Hexacomb a clear and definite competitive advantage. As discussed above, Hexacomb's CHS machines are at least five times faster than other existing machines.

### 2. Hexacomb has taken reasonable security measures under Section 2(d)(2) of the Illinois Trade Secrets Act.

■ The three confidentiality agreements signed by George Sr. (Exhibits QQ, RR and SS) were measures reasonable under the circumstances to maintain the secrecy and confidentiality of its CHS machines. Although the three agreements were signed by George Sr. while he was in the employ of Hexacomb's predecessors-in-interest, Hexacomb has shown that, as a successor-in-interest, it inherited the benefit of those agreements.

Other current Hexacomb employees, such as Manuel Luera, also signed such agreements with Lancaster and Hexcel. Employees who were not transferred from Hexcel, such as William Royster and William Renick, signed confidentiality agreements with Hexacomb. (Group Exhibit A).

■ Even if it is assumed that George Sr. did not sign these agreements, under Illinois law, the existence of a confidential agreement is not a prerequisite to recovery for misappropriation of trade secrets or breach of a confidential relationship. In upholding the issuance of an injunction against the misappropriation of trade secrets by a former employee, the Court in *Televation Telecommunication Systems, Inc. v. Saindon et al.*, 169 Ill.App.3d 8, 119 Ill.Dec. 500, 522 N.E.2d 1359 (2nd Dist.1988), stated that "[a]n employer has a recognized business interest in protecting trade secrets disclosed in confidence to the employee during the course of his employment ... even where ... there is no enforceable restrictive covenant between the parties." *Id.* 522 N.E.2d at 1362 (citations omitted).

■ Hexacomb acquired the Michigan City plant of Hexcel as an operating business. As shown in the acquisition agreement, Exhibit TT, at paragraph 1.6, Hexacomb acquired "Hexcel's good will, customer lists, sales information, manufacturing procedures and proprietary know-how which relate to the operation of the Michigan City plant." The agreement also transferred the patents (par. 1.4), the inventory (par. 1.3), the orders (par. 1.8), the plant (par. 1.8), the records (par. 1.10), trademarks (par. 1.12) and other property.

■ An asset purchase is considered a *de facto* merger when the effect is to have the business taken over by the successor corporation. George Sr. himself admitted that there was nothing different after the acquisition by Hexacomb. (Wroblewski Dep., pp. 269).

■ A purchaser corporation assumes the seller corporation's liabilities where "the purchaser corporation is merely a continuation of the seller" or where "the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability." *Goldstein v. Gardner*, 444 F.Supp. 581, 583 (N.D.Ill.1978). Hexacomb carried on the business as before and there was a noncompete agreement with Hexcel (Article 14 of Exhibit TT) which means that Hexcel left the business to Honeycomb. *See Goldstein*, 444 F.Supp. at 584.

Article 12 of the acquisition agreement even provided that "Hexcel shall cooperate and assist in the orderly transfer of employees from Hexcel to IHC [Hexacomb]." George Sr. admitted that he was not aware of anyone who lost his job. (Wroblewski Dep., p. 259). Therefore, we consider Hexacomb to be the continuation of Hexcel when it comes to the employment agreements.

■ A successor corporation in an asset purchase can enforce confidentiality agreements and covenants not to compete that an employee signed with its predecessor corporation. *A. Fink & Sons v. Goldberg*, 101 N.J.Eq. 644, 139 A. 408 (Ct.Chan.1927). "Upon the sale of a business, a restrictive covenant made in connection with such sale is assignable without express words to that effect, and passes as an incident of the business sold, even though not specifically assigned.... This necessarily follows if 'the agreement can have no independent existence or vitality aside from the business' ... and this is because it was made for the benefit of the business and not the individual parties to the contract." 139 A. at 409–410. "The covenant is perhaps more nearly analogous to the express or implied covenant of an employee not to divulge his employer's trade secrets, the violation of which is considered as a betrayal of confidence reposed in the employee by the employer. Such covenants are made for the benefit of the business, and are uniformly enforced." 139 A. at 410. *See also Albalene Pest Control Services, Inc. v. Hall*, 126 Vt. 1, 220 A.2d 717 (1966); *Thames v. Rotary Engineering Company*, 315 S.W.2d 589 (Tex.Civ.App.1958).

The employee confidential information agreements signed by George Sr. were made for the benefit of the business at the Michigan City Plant and, therefore, they were transferred with that business to Hexacomb.

The assignment of assets to Hexacomb specifically included "Hexcel's good will, customer lists, sales information, manufacturing information and proprietary know-how which relate to the operation of the Michigan City plant" and "all agreements relating to the operation of normal business at the Michigan City plant." (Exhibit TT, para. 1.6 and 7.6). This would include the employment agreements.

Because George Sr. continued to accept the same job and responsibilities, he also accepted the same obligations. *See Safier's Inc. v. Bailer,* 59 Ohio Law Abs. 292, 93 N.E.2d 734, 736–7 (Ct. of Com.Pleas, 1950) where the court held that by accepting employment with the successor corporation, the employee "effected a novation, whether such a novation was necessary to the right to enforce the restrictive covenant or not." 93 N.E.2d at 739. Here George Sr. continued to be employed by Hexacomb and effected such a novation.

Similarly, Illinois courts have recognized the assignability of confidentiality and non-compete agreements. In *Hamer Holding Group v. Elmore,* 202 Ill.App.3d 994, 148 Ill.Dec. 310, 320, 560 N.E.2d 907, 917 (1st Dist.1990), the court held that the successor in an asset purchase could enforce a confidentiality and covenant not to compete agreement made with its predecessor corporation.

Like the defendants in the cases cited above, George Sr., after each change of employers, continued to do the same work and accept the same benefits. The plant "operated about the same way" after Hexcel took over, and "as far as [he] can remember" George Sr. went to work one day as a Celadyn Employee and came back the next day as a Hexcel employee. (Wroblewski Dep., p. 254–258). He kept the same job of maintenance supervisor, continued to work on the same machines, and kept the same seniority, vacation, and insurance benefits. (Wroblewski Dep., pp. 261, 265–266, 269). Even the phone number stayed the same. (Wroblewski Dep., p. 254).

■ George Sr. left Hexacomb in February 1982 but returned to Hexacomb in December 1982, eight months later. George Sr. again had the same position of maintenance supervisor including the same duties and responsibilities. (Wroblewski Dep., pp. 278–279). Hexacomb has shown, and this Court finds, that George Sr.'s brief absence did not affect the enforceability of the agreements because George Sr. came back to the same job with the same responsibilities. Under the rationale of *MBL U.S.A. Corp. v. Diekman,* 112 Ill.App.3d 229, 67 Ill.Dec. 938, 445 N.E.2d 418 (1st Dist.1983), George Sr.'s confidentiality agreements would be enforceable even though he left for eight months. The duty of confidentiality is continuing and is the same during and after employment. "It is an absolute, not a relative duty." *L.M. Rabinowitz & Co., Inc. v. Dasher,* 82 N.Y.S.2d 431, 78 U.S.P.Q. 163, 165 (N.Y.S.Ct. 1948).

■ We also find that there was adequate consideration for the employment agreements because continued employment after the signing of a confidential employment agreement is sufficient consideration. The July 24, 1972 Lancaster agreement was signed by George Sr. at the start of George Sr.'s employment and was followed by approximately four years of continuous employment. The September 21, 1976 Hexcel agreement was also signed at the start of George Sr.'s employment with Hexcel and was followed by approximately three and a half years of continuous employment. The February 27, 1979 reaffirmation agreement was followed by 13 years of employment with Hexacomb. At the time George Sr. signed the reaffirmation agreement, he knew he was going to work for Hexacomb and he filled out an application for insurance with Hexacomb the very same day. (Wroblewski Dep., pp. 275–276; Exh. 136).

We find that the employment agreements signed by George Sr. put him on notice as to the confidential nature of the CHS machines. The confidential nature of Hexacomb's CHS machines was further made clear to George Sr. during the exit interviews discussed above.

Hexacomb has shown that the design of its CHS machines are not generally known to any one else in the industry and George Sr.'s

testimony was that he is aware of no one outside of Hexacomb with a continuous-feed machine of Hexacomb's design. (Hearing, pp. 347–350). Hexagon Corporation, one of Hexacomb's competitors prior to 1993, tried unsuccessfully to get better designs. Hexagon's search included working with numerous machine shops and designers, and even asking George Smith, one of the witnesses in this case and a former Hexacomb employee, if he could tell them how Hexacomb's machines worked.

The evidence also established that the only source outside of Hexacomb with any knowledge of Hexacomb's continuous-feed CHS machine was Peotone Machine Company ("Peotone"). However, such disclosure was of the blade section only and was pursuant to a confidentiality agreement signed by Lloyd Collins of Peotone and witnessed by George Sr. In that agreement, Hexacomb's continuous-feed CHS machine is particularly identified as "proprietary" and "confidential." (Exhibit U).

Additionally, Hexacomb has shown that its continuous-feed CHS machines are complicated machines which one could not determine how to build without close inspection and measurement. This can be seen by the testimony of Colin Burgess who, despite having seen Hexacomb's CHS machines, was surprised that they could operate at twice the rate of any design he could think of. (Hearing, pp. 900–902). Mr. Burgess also signed a confidentiality agreement with Hexacomb. (Exhibit PP). George Sr. himself specifically admitted that unless one saw the continuous-feed CHS machines operating and took careful measurement of the machines, it was not possible to determine how they operated or what was needed to duplicate the machines. (Hearing, pp. 347–348, 361–363).

### 3. Defendants Misappropriated Hexacomb's CHS Machine.

 In pertinent part, misappropriation of a trade secret is defined in the Illinois Trade Secrets Act, 765 ILCS 1065/2(b)(2)(B)(II) as follows:

"(b) Misappropriation means:

. . . . .

(2) disclosure or use of a trade secret of a person without express or implicit consent by another person who:

. . . . .

(B) at the time of disclosure or use knew or reason to know that knowledge of the trade secret was:

. . . . .

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or to limit its use"

We find that the Defendants' machine is a direct result of the Defendants' knowledge of Hexacomb's machines. George Sr. admitted at the hearing that no one outside of Hexacomb knows the designs and that his only source of information about the designs of CHS machines comes from Hexacomb. (Exhibit D, TRO Hearing, pp. 78–79; Hearing p. 361).

As testified to by Mr. Carder, the GTW machine is identical in substance to Hexacomb's machines. Even mistakes were copied. (Hearing, pp. 607–608, 643–644). Defendants presented evidence as to improvements in their machines. However, we find that the improvements are the direct result of the Defendants' knowledge of Hexacomb's machines. The evidence in this case is that virtually one hundred percent of George Sr.'s CHS machine knowledge was obtained from his work on the CHS machines at Hexacomb's University Park plant. While George Sr. did not copy every feature, it is clear that what he did was copy every feature that he felt would work and then improve on all the features he felt he could economically improve upon. The improvements pertained to such things as reinforcement of parts to make the machine stronger or dimensional changes many of which Hexacomb had planed to include in its next machines.

 Even if it were concluded that GTW's machine is an improvement, such improvement is immaterial as a matter of law since the substance of the machine was misappropriated. See Matter of Innovative Const. Systems, Inc., 793 F.2d 875, 886–87 (7th Cir.1986). We find that the Defendants did not use any source of information about

the design of CHS machines other than that learned by George Sr. while he was employed by Hexacomb. It is well established that the availability of lawful or public means of gaining the trade secret information is not a defense where those means were not utilized. *See Goldberg v. Medtronic, Inc.,* 686 F.2d 1219, 1226–28 (7th Cir.1982).

Hexacomb has also shown, pursuant to 765 ILCS 1065/2(b)(2)(B)(II), that George Sr. was on notice of the confidential and trade secret status of Hexacomb's CHS machines at the time he began building his first CHS machine at GTW. This is apparent in view of, among other things, the confidentiality agreements which he signed (including the 1984 Peotone agreement), his reading of the May 8, 1991 memo pertaining to the need to maintain product and process confidentiality, and his exit interviews with William Renick wherein he was reminded of the confidential and trade secret status of Hexacomb's CHS machines. Therefore, we find that George Sr. was on notice as to the confidential and trade secret status of the CHS machines at the time he made use of that confidential information.

For the foregoing reasons, we find that Hexacomb will likely succeed in proving its claim that the Defendants have misappropriated Hexacomb's trade secrets.

### E. *The Balance of the Harms Weigh in Hexacomb's Favor*

The degree of likelihood of success on the merits which a plaintiff must demonstrate decreases the more heavily the balance of harms weighs in its favor. *Brunswick Corp.,* 784 F.2d at 275. This is the sliding scale approach which the Seventh Circuit has used so that "even though a plaintiff has less than a 50 percent chance of prevailing on the merits, he may nonetheless be entitled to the injunction if he can demonstrate that the balance of the harms will weigh heavily against him if the relief were not granted ..." *Curtis v. Thompson,* 840 F.2d 1291, 1296 (7th Cir.1988); *C.B. Fleet Co., Inc. v. Complete Packaging Corp.,* 739 F.Supp. 393, 397 (N.D.Ill.1990).

Where the potential for harm is great, a party need only show it has a "better than negligible chance" of success for a preliminary injunction to issue. *Brunswick Corp. v. Jones,* 784 F.2d 271, 275 (7th Cir. 1986). We have found that the sale of continuous-feed CHS machines would cause irreparable harm to Hexacomb and would radically undermine Hexacomb's sales and profit margins, and that the Defendants likely could not satisfy a damage award. Thus, Hexacomb has shown that the balance of the harms weighs heavily in its favor.

**WHEREFORE, FOR THOSE REASONS SO STATED HEREIN, IT IS ORDERED AND ADJUDGED** that Hexacomb's Motion for a Preliminary Injunction is granted.

**FURTHER, IT IS ORDERED, ADJUDGED AND DECREED** that:

1. Defendants GTW and George Sr., GTW's officers, directors, employees, agents, representatives, attorneys, and all other persons or entities acting or claiming to act on behalf of either Defendant, or under the direction and authority of either Defendant, or in concert or in participation with either Defendant, who receive actual notice of this order by personal service or otherwise, are preliminarily enjoined from:

(a) designing, building, selling, using, releasing, moving, transferring, shipping or delivering any continuous-feed CHS machine whose design is based, in whole or in part, on the designs used by Hexacomb;

(b) directing any third party to move, transfer, ship or deliver any such CHS machines for the manufacture of paper honeycomb core; and

(c) disclosing or using information pertaining to the design, development, manufacture or operation of Hexacomb's CHS machines or a continuous-feed CHS machine based, in whole or in part, on the designs used by Hexacomb.

2. Until further order of this Court, Defendants may continue to service and repair the CHS machines previously delivered to Damage Prevention Products and American Honeycomb as long as those CHS machines continue to be owned by Damage Prevention

Products and American Honeycomb, respectively.

3. Pursuant to Rule 64(c), Hexacomb will post a bond in the amount of $150,000 as a condition to entry of this Preliminary Injunction.

This preliminary injunction will remain in effect until a judgment is entered on Plaintiff's petition for a permanent injunction.