SERVICE CENTERS OF CHICAGO, INC., d/b/a Deliverex of Chicago, Plaintiff-Appellee, v. JEFFREY M. MINOGUE *et al.*, Defendants-Appellants.

First District (4th Division)   No. 1—88—2448

Opinion filed March 9, 1989.

Deutsch, Levy & Engel, Chartered, of Chicago (Paul M. Levy, Scott B. Greene, and Terese Keirnan-Shust, of counsel), for appellants.

Vedder, Price, Kaufman & Kammholz, of Chicago (Richard F. Zehnle, Patricia C. Cook, and John E. Dougherty, of counsel), for appellee.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The trial court preliminarily enjoined the defendants, Jeffrey M. Minogue and Filefax, Inc., from using trade secrets and confidential information allegedly obtained during Minogue's employment with the plaintiff, Service Centers of Chicago, Inc., d/b/a Deliverex of Chicago (Deliverex). The order further enjoined the defendants from providing

services to Lutheran General Hospital. Minogue has appealed, contending that Deliverex failed to prove the existence of any trade secrets or confidential information sufficient to warrant injunctive relief. Alternatively, Minogue contends that the injunction order is facially invalid because it fails to meet the specificity requirements of section 11—101 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 11—101).

Deliverex operates a business which provides off-site medical records storage and retrieval services for health-care facilities. Deliverex formed its Chicago operation in September 1987 with Gardner Heidrick as owner and president of the franchise. The service provided by Deliverex is directed toward hospitals and other health-care facilities and consists of purging the existing medical files, storing them on open shelves at an off-site facility duplicating the hospital's filing system, and retrieving the files when needed by the hospital. Deliverex hired Jeffrey Minogue as a salesman in October 1987 and sent him to San Jose, California, to participate in a one-week training program.

Before the training program began, Minogue was required to sign what the parties refer to as a confidentiality agreement, which stated in part:

"1. *Acknowledgement of Trade Secrets.* The Employee hereby acknowledges that the information and materials provided to him/her by the Company and/or Deliverex, Inc., Securex Inc.,[1] its employees, franchisees, agents or business advisors concerning or in any way relating to the Company, Deliverex, Inc. and/ or Securex Inc., or services or products associated with the trademark Securex, Inc. and/or Deliverex, Inc. are confidential and are trade secrets.

2. *Covenant Not To Disclose.* The Employee hereby agrees not to disclose or disseminate any information or material provided to him/her by the Company, Securex, Inc., and/or Deliverex, Inc. or their employees, agents or business advisers to any person or entity whatsoever other than the Employee's attorneys, accountants or business advisors.

3. *Restriction on Use.* The Employee agrees that he/she will not use any confidential information or trade secrets received from Securex, Inc. and/or Deliverex, Inc. or their employees, franchisees, agents or business advisors in the event that the

---

[1]Securex, Inc., is described in the record as the master franchisee of Deliverex, Inc., with world-wide rights to the Deliverex system. Securex, Inc., is the franchisor of Deliverex of Chicago.

Employee leaves his/her employment with the Company. To that end, it is agreed that if the Employee engages in a business similar to the business of the Company, Securex, Inc. and/ or Deliverex, Inc., within a period of two (2) years of the date the Employee discontinues his/her employment with the Company, the Employee shall assume the burden of proving that the Employee has not used any such confidential information or trade secrets in such business, regardless of the geographical location of the Employee's business."

After signing this agreement, Minogue visited an operating storage facility and reviewed certain sales and marketing materials. During his classroom training, Minogue became familiar with a survey used to analyze a potential customer's needs and determine the monthly rate to charge that customer. Minogue was also taught how to write a pricing proposal.

Minogue then returned to Chicago and began work as a salesman for Deliverex. During the course of his five-month employment with Deliverex, Minogue made sales calls upon area hospitals, including Lutheran General, where he met with the director of radiology, Judy Koptik. After making a sales presentation and conducting a survey to determine the hospital's needs, Minogue drafted and submitted a proposal containing a price quotation.

On March 8, 1988, Koptik and another hospital representative accompanied Minogue and Heidrick on an inspection of Deliverex' storage facility. At that time, the facility was in a warehouse shared by another business and was essentially inoperable. Koptik raised several objections about the condition of the facility, and Minogue later called her to apologize. During that conversation, Koptik suggested to Minogue that he start his own company.

Displeased with the Deliverex operation, Minogue tendered his resignation on March 17, 1988. One week later, he contacted Koptik and informed her that he had formed Filefax, Inc. On March 31, 1988, Filefax submitted a proposal to Lutheran General offering the same services as those offered by Deliverex. In May of 1988, Lutheran General awarded the contract to Filefax, Inc., and the instant lawsuit was filed.

In its complaint, Deliverex alleged that Minogue breached the confidentiality agreement by using confidential information or trade secrets consisting of "techniques of marketing, techniques of record organization, pricing mechanisms and business forms which have been developed by [Deliverex'] franchisor through 15 years of experience in the industry." At the hearing in the trial court, counsel for

Deliverex argued that it was the "Deliverex system, formula, method, [and] technique" that constituted a trade secret.

On appeal, Deliverex has narrowed its claim of trade secrets to the pricing formula used to calculate a flat monthly fee for each customer. The pricing formula has three main components: (1) a survey or questionnaire used to identify the customer's needs; (2) the use of a linear foot measurement; and (3) certain rules of thumb.

Charles Williams, president of Securex, Inc., testified at the hearing on the preliminary injunction that the Deliverex system of purging, storing and retrieving hospital records was unique and that it had not lost a customer in its 15 years of operation. Williams stated that although several component parts of the Deliverex system were contained in an advertising brochure and therefore not confidential, it was the entire system or process of pricing and providing services which rendered it confidential. The advertising brochure, introduced as an exhibit at trial, stated that Deliverex analyzes the hospital's needs, then stores its files off-site using the same filing system used by the hospital. The brochure further states that Deliverex offers a fixed monthly fee, daily scheduled deliveries, one-hour delivery on a "stat" basis, facsimile transmission, nearby facilities and complete interfiling retrieval and purging services. Pictures in the brochure show that the files are located on open shelves.

Williams stated that the main advantage of the Deliverex system was its ability to offer a flat monthly rate, thereby allowing the customer to predict the costs. According to Williams, all Deliverex' competitors charged customers on a "per retrieval" basis. The pricing mechanism which allowed the calculation of a flat monthly rate had three major components which were confidential: (1) a 20-page survey used to determine the needs of the customer; (2) the use of a linear foot measurement; and (3) certain "rules of thumb." The survey was not introduced into evidence at trial. However, Williams testified that it contained questions about the age, thickness and condition of the files to be stored as well as questions about the hospital's filing system. After obtaining this information, certain "rules of thumb" arrived at over the 15 years Deliverex had been in business are used as guidelines to estimate how much the customer should be charged. While Williams did not specify what "rules of thumb" were, Minogue listed certain examples. He stated that in calculating how many records are in the hospital, "you add up the number of feet of records and divide by the number of years to get an average." Another "rule of thumb" is that medical records should be 75 cents to 85 cents per foot and an X ray should be $1 to $1.15 per foot. Patient accounts

are 65 cents per foot.

At the conclusion of the hearing, the trial court issued a preliminary injunction which stated that Minogue "is hereby enjoined from utilizing the particulars that he learned confidentially as to how to implement the system either in pursuit of business for himself, Filefax, Inc. or others who could profit by the confidential information for a period of two years from the date he left the plaintiff's employ." The court further enjoined Minogue and Filefax, Inc., "from performing any further services to Lutheran General Hospital as he has been providing for two years from the date Jeffrey Minogue left the plaintiffs employ." Minogue has appealed, contending that Deliverex failed to prove the existence of any confidential information or trade secrets.

Throughout the course of this litigation, Deliverex has consistently failed to identify with any degree of particularity the alleged trade secrets or confidential information in need of protection. The confidentiality agreement signed by Minogue at the inception of his employment with Deliverex broadly recites that "the information and materials provided to [the employee] *** concerning or in any way relating to [Deliverex] *** are confidential and are trade secrets." The complaint, recited earlier, is in very general terms as were the arguments in the trial court. This lack of specificity is reflected in the trial court's order, which vaguely states that "[Deliverex'] brochure proposes the language to describe the [Deliverex] system," then enjoins Minogue from "utilizing the particulars that he learned confidentially as to how to implement the system." The specific claim before us on appeal is that the pricing formula used to calculate a fixed monthly fee is the trade secret or confidential information. The question is then whether Deliverex presented sufficient evidence at the preliminary injunction to show a probability that it would succeed in establishing that the pricing formula is a trade secret.

■ The protection accorded to trade secrets reflects a balancing of conflicting social and economic concerns. (*ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 273 N.E.2d 393.) On one hand, an employer who has invested time, money and effort in developing a secret advantage should be protected from a former employee who obtains the secret through improper means. (*Televation Telecommunication Systems, Inc. v. Saindon* (1988), 169 Ill. App. 3d 8, 522 N.E.2d 1359.) On the other hand, the court must recognize that in a society based on competition, the employee has a right to make use of the general knowledge and skills acquired through experience in pursuing the occupation for which he is best suited. *Sain-*

*don,* 169 Ill. App. 3d 8, 522 N.E.2d 1359.

The essential element to any relief under the law is the existence of confidential information or a trade secret. (*AMP, Inc. v. Fleischhaker* (7th Cir. 1987), 823 F.2d 1199.) In *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 92, 273 N.E.2d 393, 395, the Illinois Supreme Court defined a trade secret as "a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such limited other persons to whom it may be necessary to confide it." Quoting the Restatement of Torts, section 757, comment *b*, at 6 (1939), the court identified the following six factors as significant in determining the existence of a trade secret:

" '(1) [T]he extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.' " *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 93, 273 N.E.2d 393, 396.

The legislature recently extended statutory protection to trade secrets by enacting the Illinois Trade Secrets Act (Act) (Ill. Rev. Stat. 1987, ch. 140, par. 351 *et seq.* (effective January 1, 1988)). The Act defines a trade secret as follows:

" 'Trade secret' means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." Ill. Rev. Stat. 1987, ch. 140, pars. 352(d)(1), (d)(2) (effective January 1, 1988).

The focus of both the common law and the Act is on the secrecy of the information sought to be protected. Under *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 92, 273 N.E.2d 393, 395, the person claiming trade secret protection must establish that the infor-

mation was known "only to him and such limited other persons to whom it may be necessary to confide it." In the words of the Act, the information must be "sufficiently secret to derive economic value *** from not being generally known to other persons who can obtain economic value from its disclosure or use." (Ill. Rev. Stat. 1987, ch. 140, par. 352(d)(1).) The purpose of such wording is "to preclude protection for information not generally known to the public but clearly understood in a particular industry." See M. Jaeger, Trade Secrets Law §3.04, at 3—34 (1988).

■ In order to prove that its pricing formula constitutes a trade secret or confidential information within the meaning of the Act, Deliverex must establish that the value of the formula lies in the fact that it is not generally known to others who could benefit by using it. The evidence presented at the hearing on Deliverex' motion for a preliminary injunction shows that the pricing formula is made up of three parts: a customer survey, certain "rules of thumb" and the use of a linear foot measurement.

The customer survey was not introduced into evidence, and we are therefore unaware of its contents apart from the testimony of Charles Williams that it contains questions about the age, thickness and condition of the files to be stored. There is nothing in the record, however, which establishes that this information is not generally known in the medical records storage industry. Significantly, Deliverex has failed to direct us to any evidence in the record concerning the amount of time, money or effort involved in compiling the survey questions. These are factors which the court in *ILG Industries, Inc. v. Scott* considered as important in identifying a trade secret. The lack of evidence concerning these factors seems to support the conclusion that the survey failed to contain any information which was not generally known in the industry but that it instead embodied nothing more than the obvious questions any salesman in the industry would need to ask in determining a customer's needs.

The second component of the pricing formula is comprised of certain "rules of thumb." Without any significant detail they are described as "an invaluable part of the Deliverex pricing system" developed over the course of 15 years and known only to Deliverex employees "which allowed Deliverex to accurately and efficiently predict the retrieval rate and set a competitive fixed rate." Like the customer survey, Deliverex has failed to show that the information underlying these "rules of thumb" was not generally known in the medical records storage industry. Moreover, it is recognized that an employee may derive some benefit from his access to the collective

experience of his employer's business. (*Fleming Sales Co. v. Bailey* (N.D. Ill. 1985), 611 F. Supp. 507, 514.) It appears that the knowledge of estimating costs obtained by Minogue during the course of his employment with Deliverex came within the realm of general skills and knowledge which he was free to take and use in later pursuits.

The third component of the pricing formula is the use of a linear foot measurement. The sole statement regarding the linear foot measurement is that Deliverex is the only company in the industry to use this measurement in calculating price. Simply being the first or only one to use certain information does not in and of itself transform otherwise general knowledge into a trade secret. If it did, the first person to use the information, no matter how ordinary or well known, would be able to appropriate it to his own use under the guise of a trade secret. We do not believe such a result was intended by the Act.

In summary, Deliverex claims that its method of pricing is a trade secret because, at least until Minogue came on the scene, none of its competitors offered a fixed monthly fee. However, it did not establish that its ability to offer this fee was the result of information or a process which was not generally known to others. It proved only that it was the first company to offer a fixed rate and that its way of doing business was highly attractive to its customers. In the absence of any protectable trade secret or confidential information, Minogue is entitled to use the general skills he learned during his employment with Deliverex to form a competing company. Neither singularly nor cumulatively is there sufficient evidence at the preliminary injunction hearing to show a probability that Deliverex will succeed in establishing that the pricing formula is a trade secret.

■ Deliverex also argues that even if the pricing formula does not rise to the level of a trade secret, it was protected by the confidentiality agreement signed by Minogue. Even if we were to accept the contention that the pricing formula constituted the type of information which could be protected by a restrictive covenant prohibiting its disclosure or use, it is clear that the confidentiality agreement in the case at bar was overbroad. By defining confidential information as essentially all of the information provided by Deliverex to Minogue "concerning or in any way relating" to the services offered by Deliverex, the confidentiality agreement amounts in effect to a postemployment covenant not to compete which is completely unrestricted in duration or geographical scope. This type of covenant is unreasonable and will not be enforced. *Dryvit System, Inc. v. Rush-*

*ing* (1985), 132 Ill. App. 3d 9, 477 N.E.2d 35.

Our disposition of this cause makes it unnecessary to consider Minogue's contention concerning the facial invalidity of the injunction order.

For the foregoing reasons, the judgment of the trial court is reversed.

Reversed.

JOHNSON and LINN, JJ., concur.