**WEB COMMUNICATIONS GROUP, INC., Plaintiff,**

v.

**GATEWAY 2000, INC. and Quebecor Printing (USA) Corp., Defendants.**

No. 93 C 6821.

United States District Court, N.D. Illinois, Eastern Division.

March 29, 1995.

---

Howard B. Rockman, Kara Eve Foster Cenar, Robert Mark Halligan, John L. Ambrogi, Welsh & Katz, Ltd., Chicago, IL, for Web Communications Group, Inc.

Michael R. Levinson, Janice Levy Block, Alan S. Dalinka, Seyfarth, Shaw Fairweather & Geraldson, Chicago, IL, for Gateway 2000, Inc.

Monica L. Thompson, Marianne C. Holzhall, Keck, Mahin & Cate, Chicago, IL, for Quebecor Printing.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Web Communications Group, Inc. brings this five count action against Gateway 2000, Inc. and Quebecor Printing (USA) Corp., alleging violation of the Illinois Trade Secrets Act, unjust enrichment, breach of contract, tortious interference, and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. Also present in this action is defendant Gateway's counterclaim, including claims for fraud and "money paid and received." Presently before the court are defendants' motions for summary judgment on Counts I, II, and III of plaintiff's second amended complaint, Gateway's motion to dismiss or for summary judgment on Count V, and Quebecor's motion to dis-

miss Count V.[1] For the reasons set forth below, defendants' motion for summary judgment on Counts I, II, and III is granted and defendants' motion to dismiss Count V is granted.

## I. Background

Plaintiff Web Communications, Inc. is a promotional marketing and print production management company. It conceives of advertising concepts for use in print media; in addition, it arranges for the printing of such advertisements by third-party printers. Defendant Gateway 2000, Inc. manufactures personal computers, which it sells on a direct-mail basis through advertisements in national computer magazines. Defendant Quebecor Printing (USA) Corp. is a commercial printing company. Between July, 1990 and February, 1991, Web arranged fifteen separate print jobs for Gateway, for a total cost of approximately $2.5 million. In 1991, Web and Gateway began discussing a concept, the "stepped insert," for Gateway's ads. Although stepped inserts had been used in the printing industry before, they had not been incorporated in a "perfect bound" magazine. Web president Gary Jacobsen testified in his deposition that he spent "three, four hours, perhaps" to develop the basic stepped insert at issue in this action. The insert he developed is essentially a multi-page, staggered magazine insert with backbone pasting, gatefold extension, and cover.[2] Web also created dummies of the insert, which are blank mock-ups of the proposed advertisement, and prepared specifications of the insert, including its actual dimensions and instructions for its execution.[3]

Web and Gateway continued discussions regarding the stepped insert project. Jacobsen asserts that he and Barbara Gross, Gateway's Creative Services Director, reached an agreement, based upon the companies' prior dealings and the discussions between Jacob-sen and Gross, to have Web handle the print job. On December 16, 1991, Jacobsen sent Gross a confirmation order for the project. In the cover letter, Jacobsen stated that, pursuant to his discussions with Gross, he had reserved press time for the printing job. He also stated, "Please call me to advise what I should do. If you want me to proceed, please initial the enclosed job confirmation and fax it back to me by the day's end on December 17, 1991." Gateway did not sign the confirmation document. Instead, it retained Quebecor to handle the printing of the advertisements. Although Quebecor also used a stepped insert for the Gateway ads, Quebecor's insert did not utilize a press-pasted backbone. After Jacobsen saw the Gateway ads in various computer magazines, he wrote a letter to Barbara Gross expressing his surprise that Web had not been retained to do the work, and stating that he had recalculated Web's prices for future stepped insert printings. When Jacobsen did not hear back from Gross, he referred the matter to his attorneys.

## II. Legal Standards

### A. Summary Judgment Standard

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact, and . . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). Once the moving party has done this,

---

**1.** Also pending before the court is defendant Quebecor's motion for summary judgment on Count IV and plaintiff's motion for summary judgment on defendant Gateway's counterclaim. Those motions shall be addressed in a later opinion.

**2.** According to Jacobsen, the backbone pasting was necessary because a stapled or stitched advertisement can not be run in a perfect bound magazine. Jacobsen also identifies the backbone pasting as contributing to the stepped insert's alleged trade secret status.

**3.** It is undisputed that Web does not charge its clients directly for development services. Instead, it factors the cost of development work into the price it charges the client in the event Web is retained to do the work.

the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court must read all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991).

### B. Motion to Dismiss Standard

A motion to dismiss should not be granted unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Beam v. IPCO Corp.,* 838 F.2d 242, 244 (7th Cir.1988); *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986). We take the "well-pleaded allegations of the complaint as true and view them, as well as reasonable inferences therefrom, in the light most favorable to the plaintiff." *Balabanos v. North Am. Inv. Group, Ltd.,* 708 F.Supp. 1488, 1491 n. 1 (N.D.Ill.1988) (citing *Ellsworth* ).

### III. Discussion

#### A. Count I (Illinois Trade Secrets Act)

 The Illinois Trade Secrets Act, 765 ILCS 1065 *et seq.,* prohibits misappropriation of trade secrets. The Act defines a trade secret as follows:

"Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons

who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). Defendants raise several arguments in support of their contention that Web's Trade Secrets Act claim must fail. They first assert that the stepped insert is incapable of being a trade secret because it was the result of publicly available knowledge. It is well established that a product or service which is "within the realm of general skills and knowledge" in the industry can not a trade secret. *Service Centers of Chicago, Inc. v. Minogue,* 180 Ill.App.3d 447, 129 Ill. Dec. 367, 372, 535 N.E.2d 1132, 1137 (1989). As Web acknowledges, stepped inserts have been "used for years" in the printing industry. Indeed, such inserts had previously been used in annual reports and envelope stuffers. Web asserts, however, that the stepped insert it created for Gateway was the first which could be run inside a "perfect" bound national computer magazine. This fact alone, however, does not make the Web stepped insert a trade secret; "[s]imply being the first or only one to use certain information does not in and of itself transform otherwise general knowledge into a trade secret." *Id.* Instead, Web must demonstrate that the leap from the previously used stepped inserts to the stepped insert developed by Web can be fairly characterized as "not generally known or easily duplicated by the industry." *Computer Care v. Service Sys. Enters., Inc.,* 982 F.2d 1063, 1075 (7th Cir.1992). As the Seventh Circuit noted in *Computer Care,* a primary factor in such an analysis is " 'the amount of time, money, or effort involved' " in developing the alleged trade secret. *Id.* at 1074 (quoting *Service Centers,* 129 Ill.Dec. at 371, 535 N.E.2d at 1136). In the present case, Web president Gary Jacobsen testified in his deposition that it took him "three, four hours, perhaps" of sketching drawings and folding paper to come up with the stepped insert at issue.[4]

**4.** Perhaps aware of the damaging effect this admission has on Web's claim, Jacobsen filed an affidavit in conjunction with Web's response to defendants' motion in which he claims it took "a substantial amount of time and effort over seven months" to complete. We initially observe that a

party opposing a motion for summary judgment can not defeat the motion by creating factual issues through affidavits which contradict prior sworn statements. *Darnell v. Target Stores,* 16 F.3d 174, 176 (7th Cir.1994); *Donohoe v. Consolidated Operating & Prod. Corp.,* 982 F.2d 1130,

**320**

In addition, he testified that he did not consult with anyone, or seek assistance, in initially developing the stepped insert. In light of these facts, we must conclude that the product at issue is not a protectable trade secret. Stepped inserts were well-known and used in the printing industry, and developing a stepped insert which could be run in the computer magazines at issue required very little time, money, or effort. *See, e.g., Computer Care,* 982 F.2d at 1073, 1075 (no trade secret where record devoid of evidence of substantial expenditure of resources in conjunction with development of alleged trade secret).

■ Web's trade secret claim also fails because Web took virtually no steps to protect the confidentiality of the stepped insert. As noted above, the Act requires that there be reasonable efforts "to maintain [the] secrecy or confidentiality" of the product in order to claim trade secret status. 765 ILCS 1065/2(d). It is undisputed that none of the documents relating to the stepped insert bears a confidentiality stamp or designation, notwithstanding Jacobsen's testimony that Web's practice is to stamp as "confidential" all protected materials. Nor did Web have a non-disclosure or other confidentiality agreement with Gateway regarding the project. Furthermore, Web disclosed either dummies or specifications for the stepped insert at issue to paper suppliers and printers, including a Web competitor, Lehigh Press. None of these disclosures was designated confidential or included a confidentiality agreement. Indeed, with respect to Lehigh, Jacobsen acknowledged that "it was a possibility" that Lehigh would take the information Web had sent them and use if for their own benefit.[5]

■ Web's primary response is that industry custom and implicit confidentiality were sufficient to protect the secrecy of the stepped insert. We initially observe that the Printing Trade Customs, which Web cites in support of its argument, are of limited value in the present action. Rather than dealing with the confidentiality of items developed and produced in the printing industry, they focus primarily on *ownership* of those items. *See, e.g.,* Pl.'s Mem.Opp.Summ.J. at 5 (Printing Trade Customs provide that products created or furnished by a printer "remain his exclusive property"). Indeed, the Customs make no mention of either confidentiality or secrecy. The same is true of Web's expert, Vince Mallardi. Most of his affidavit is dedicated to the issue of ownership, rather than confidentiality, of work created by printers. Furthermore, to the limited extent Mallardi discusses the implicit confidentiality accorded such work in the industry, his assertion is, of course, undermined by Jacobsen's own testimony that Web routinely stamped as "confidential" those items it believed to be confidential.

In any event, a similar argument regarding "implicit confidentiality" was rejected in *National Presto Indus., Inc. v. Hamilton Beach, Inc.,* 18 U.S.P.Q.2d 1993, 2003, 1990 WL 208594 (N.D.Ill.1990). There the court concluded that such a claim was insufficient to establish reasonable efforts to maintain confidentiality where other protections were lacking. *Id.* The same rule of law applies equally here. Although the issue of whether efforts to maintain confidentiality were reasonable is frequently one for the jury, *see, e.g., Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.,* 925 F.2d 174, 179 (7th Cir.1991), such a proposition has limited applicability in a case, such as this, where the plaintiff took virtually no steps to insure the confidentiality of the stepped insert. *Cf. Rockwell,* 925 F.2d at 176–77 (jury question where plaintiff stamped drawings confidential, required employees and vendors to sign confidentiality

---

1136 (7th Cir.1992). Accordingly, to the extent that Jacobsen's affidavit conflicts with the deposition testimony, we shall ignore it. In any event, the relevant period of time for our purposes is *not* the time associated with the manufacture of the final product for Gateway, but the time spent developing the dummy of the stepped insert in the first place (*i.e.,* the alleged trade secret). As evidenced by Jacobsen's deposition testimony, that length of time was only three to four hours.

**5.** Web has objected to defendants' recitation of Jacobsen's deposition testimony on this point. While we acknowledge that the manner in which defendants quoted Jacobsen could lead to some confusion as to his actual testimony, we have the transcript before us, and are thus able to ascertain what was said by whom. Accordingly, Web's "Motion to Correct Inaccurate Citation in Defendants' Reply Brief" is denied.

agreements, kept documents in vault guarded by security officer, and retaining original drawings). Accordingly, we conclude that the stepped insert at issue cannot qualify as a trade secret. Defendants are therefore, entitled to summary judgment on Count I.

### B. Count II (Unjust Enrichment)

■ Defendants also move to dismiss Count II, in which Web alleges that defendants have obtained an unjust enrichment. To the extent that Web purports to state a claim for unjust enrichment based on alleged misappropriation of a trade secret, this claim is preempted by section 8 of the Illinois Trade Secrets Act, which provides, in relevant part:

(a) Except as provided in subsection (b), this Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret.

(b) This Act does not affect:

(1) contractual remedies, whether or not based upon misappropriation of a trade secret....

765 ILCS 1065/8. Web acknowledges that unjust enrichment is essentially a claim for restitution. As a result, Count II, to the extent directed at trade secret misappropriation, is preempted. *See, e.g., Hutchison v. KFC Corp.,* 809 F.Supp. 68, 71 (D.Nev.1992) (unjust enrichment claim preempted by same language); *see also Venango River Corp. v. NIPSCO Indus., Inc.,* No. 92 C 2412, 1994 WL 702759, at *8 (N.D.Ill. Dec. 15, 1994) (noting preemption generally and *Hutchison* specifically).

■ Web also asserts, however, that its claim should apply even if, as we have held, the stepped insert does not qualify as a trade secret. Web asserts that it had a reasonable expectation of being awarded any jobs aris-

ing from its "developmental work." Web then asserts:

Web's unfulfilled expectation to recover its costs through an award of the printing work for the stepped insert advertisements establishes a cause of action for unjust enrichment arising from the doctrine of quasi-contract under Illinois law.

We disagree. In *Van C. Argiris & Co. v. FMC Corp.,* 144 Ill.App.3d 750, 98 Ill.Dec. 601, 604, 494 N.E.2d 723, 726 (1986), the plaintiff, a real estate broker named Argiris, introduced the defendant, a corporation seeking to sell its plant, with a prospective buyer. The plaintiff also took the buyer on a tour of the plant and kept in close contact with the buyer, all in the hopes that the defendant would sell its plant to the buyer, and that Argiris would earn a commission on the sale. The corporation subsequently sold its plant to the buyer, but through a different real estate broker. Argiris sued the corporation, the buyer, and the successful broker, claiming unjust enrichment. The trial court ruled in favor of defendants, and Argiris appealed. The Illinois Appellate Court affirmed:

It is obvious that Argiris' goal in performing these activities was to attract [the corporation] and obtain the award of an exclusive listing with [the corporation]. Where, as here, preliminary services are rendered to gain a business advantage with the expectation of obtaining a hoped-for contract, without any reasonable anticipation on the part of either the plaintiff or the defendant that reimbursement will *directly* result, quasi-contractual relief is unwarranted.

*Id.* 98 Ill.Dec. at 605, 494 N.E.2d at 727 (emphasis added). The same analysis applies equally here. It is undisputed that Web did not expect to be directly compensated for its efforts; instead, Web undertook the work in the hope that it would ultimately obtain the printing job. Under the rationale of *Van C. Argiris & Co.,* then, Web cannot prevail on its claim for unjust enrichment.[6]

---

**6.** Web cites *Midcoast Aviation, Inc. v. GECC,* 907 F.2d 732 (7th Cir.1990), in support of its argument that it can maintain its claim of unjust enrichment. In that case, however, the parties agreed, in connection with preparatory work that Midwest was performing for defendants in anticipation of a long-term contract, that "[i]f no such agreement was reached ..., Midcoast would immediately demand payment." *Id.* at 735. Because plaintiff had an expectation of direct reimbursement for its costs in the event no agreement was reached, *Midcoast* is inapposite to the present case.

Accordingly, defendants are entitled to summary judgment on Count II.

### C. Count III (Breach of Contract)

■ In Count III, Web asserts that it had an oral contract with Gateway based upon Jacobsen's prior course of dealing, relationship, and conversations with Barbara Gross. It is undisputed, however, that the written contract sent to Gateway regarding the stepped insert was never signed. Accordingly, we must determine whether the occurrences cited by Web gave rise to an enforceable contract. In *Quake Constr., Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990 (1990), the Illinois Supreme Court noted that, where parties intend to make the reduction of an agreement to writing a condition of its enforceability, the agreement does not constitute a "contract" until the agreement is, in fact, in writing. *Id.* 152 Ill.Dec. at 312, 565 N.E.2d at 994 (citations omitted). The court continued:

> In determining whether the parties intended to reduce their agreement to writing, the following factors may be considered: whether the type of agreement is one usually put into writing, whether the agreement contains many or few details, whether the agreement involves a large or small amount of money, whether the agreement requires a formal writing for the full expression of the covenants, and whether the negotiations indicated that a formal written document was contemplated at the completion of the negotiations.

*Id.* (citations omitted). In the present case, it is undisputed that in each of the fifteen prior print jobs Web handled for Gateway, the parties entered into a written agreement. In addition, the printing job involved numerous issues, including price, quantity, type of paper to be used, time frame, and the magazines running the ad. As for amount of money, Web's quoted price exceeded $300,000. Finally, the negotiations clearly indicated, as they had in the past, that a final order (like the one sent by Web to Gateway in connection with the stepped insert) would

follow the negotiations. Indeed, in the cover letter attached to the order, Jacobsen states, "If you want me to proceed, please initial the enclosed job confirmation and fax it back to me by the day's end on December 17, 1991." This statement alone suggests the absence of a contract based upon the parties' course of dealing and conversations. In sum, the factors identified in *Quake Constr., Inc.* indicate that the parties intended a written contract to formalize any negotiation. Accordingly, Web cannot now claim that its course of dealing with Barbara Gross or discussions regarding the stepped insert independently gave rise to an enforceable contract.[7]

For example, in *Lal v. Naffah*, 149 Ill. App.3d 245, 102 Ill.Dec. 806, 500 N.E.2d 699 (1986), the plaintiff, a physician, maintained that he entered into an oral agreement with the defendant which entitled him to a percentage of the parties' profits. However, the written document submitted to Lal after the negotiations did not include a profit-splitting provision. Lal refused to sign the contract, but continued working for five years. He then sued for a split of the profits pursuant to the alleged oral agreement. The court affirmed summary judgment for the defendant:

> Where parties intend for a written or formal contract to follow negotiations, there can be no agreement until the written document is executed. Even if an understanding of this kind between the parties had been lacking, there was sufficient precedent with the procedures followed with the former expired contract to have alerted Lal that a writing of some kind of memorializing their agreement would shortly follow.

*Id.* 102 Ill.Dec. at 809, 500 N.E.2d at 702 (citations omitted). The above analysis is equally applicable here. Accordingly, defendant Gateway's motion for summary judgment on Count III is granted.

### D. Count V (Consumer Fraud and Deceptive Business Practices Act)

■ Finally, defendants move to dismiss Count V, which is grounded in the Illinois

---

7. In any event, any such "contract" would be too indefinite to be enforceable. *See Academy Chicago Publishers v. Cheever*, 144 Ill.2d 24, 161 Ill. Dec. 335, 578 N.E.2d 981, 983 (1991). Web asserts that "there was an agreement to award

Web any printing jobs using Web's development work." However, the scope of that agreement, including price, delivery dates, and other vital elements, were first set forth on the "Confirming Order," which was not signed by Gateway.

Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*[8] Section 2 of that Act provides, in relevant part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use of any deception, fraud, false pretense, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2. As its name indicates, the Consumer Fraud Act is primarily concerned with protecting consumers. *See Hill v. Names & Addresses, Inc.*, 212 Ill.App.3d 1065, 157 Ill.Dec. 66, 82, 571 N.E.2d 1085, 1101 (1991) (noting that liability under the Act is limited to " 'conduct that implicates consumer protection concerns' ") (quoting *Jays Foods v. Frito–Lay*, 664 F.Supp. 364, 368 (N.D.Ill.1987)). This fact notwithstanding, it is well established that plaintiffs need not actually be "consumers;" business have standing to bring actions under the Act. *See* 815 ILCS 505/1(c); *Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc.*, 657 F.Supp. 1486, 1493 (N.D.Ill.1987). However, when the dispute involves two business, "the test for standing is whether 'the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns.' " *Gadson v. Newman*, 807 F.Supp. 1412, 1421 (C.D.Ill. 1992) (quoting *Downers Grove Volkswagen v. Wigglesworth Imports, Inc.*, 190 Ill.App.3d 524, 137 Ill.Dec. 409, 417, 546 N.E.2d 33, 41 (1989)).

In the present action, Web has failed to identify any misrepresentation by Gateway or Quebecor which affected a consumer, or otherwise implicated consumer protection concerns. Indeed, rather than attempting to demonstrate a consumer nexus, Web challenges defendants' suggestion that such a nexus is still required. In support, Web points to a 1990 amendment to the Act, which states that "proof of public injury, a pattern, or other effect on consumers generally" is not required to sustain a claim under the Act. 815 ILCS 505/10a(a). This amendment was passed to clarify that a plaintiff suing under the Act could state a claim based upon a single, isolated injury, and based solely upon the plaintiff's own injury. *See Rubin v. Marshall Field & Co.*, 232 Ill.App.3d 522, 173 Ill.Dec. 714, 720, 597 N.E.2d 688, 694 (1992). In other words, the amendment expanded the scope of injuries to consumers cognizable under the Act; however, contrary to Web's assertion, it did not eliminate the requirement of a connection to consumers altogether. *CTS Corp. v. Raytheon Co.*, No. 92 C 3878, 1993 WL 157464, 1993 U.S.Dist. LEXIS 6442, at *5–*8 (N.D.Ill. May 11, 1993). Because Web has failed to allege the necessary nexus to consumer protection concerns, we conclude that Web cannot state a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act. Accordingly, defendants' motion to dismiss Count V is granted.[9]

## IV. Conclusion

For the reasons set forth above, defendants' motion for summary judgment on Counts I, II, & III is granted, and defendants' motion to dismiss Count V is granted. Defendant Gateway's alternative motion for summary judgment on Count V is denied as moot. It is so ordered.

---

8. Gateway moves, in the alternative, for summary judgment on Count V. However, because we conclude that defendants are entitled to dismissal of that count, we deny Gateway's motion for summary judgment as moot.

9. Quebecor has moved to strike the second declaration of Web president Gary Jacobsen, which was attached to Web's response to Quebecor's motion to dismiss Count V. Because we have not relied upon the declaration in ruling on the motion to dismiss Count V, Quebecor's motion is denied as moot.