**ATHEY PRODUCTS CORPORATION,**
Plaintiff–Appellant,

v.

**HARRIS BANK ROSELLE,**
Defendant–Appellee.

No. 95–3557.

United States Court of Appeals,
Seventh Circuit.

Argued March 25, 1996.

Decided July 15, 1996.

Quinton F. Seamons, Robert F. Forrer, Todd A. Rowden (argued), Wilson & McIlvaine, Chicago, IL, for Plaintiff–Appellant.

James E. Spiotto, James M. Breen (argued), Dianne E. Rist, Chapman & Cutler, Chicago, IL, for Defendant–Appellee.

Before BAUER, RIPPLE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

When does a typical lender–borrower relationship constitute fraud upon one of the borrower's unsecured creditors who supplied equipment to fill the borrower's purchase orders, but did not get paid? In this case, not when the lender keeps the borrower solvent (by extending nearly $1.6 million on a line of credit) only long enough for the lender to recover payments on the borrower's sale of equipment to third-party end users. This is not good news for an unsecured creditor like the Athey Products Corporation who brings us this appeal.

Athey, the plaintiff in this diversity case, is a manufacturer of street sweepers and other road maintenance equipment. It sells equipment to distributors for eventual sale to end users, including cities, towns, counties, and other municipalities. In 1991, Schuster Equipment Company, a distributor and dealer of Athey's equipment, borrowed money on a line of credit from its lender, the Harris Bank of Roselle, Illinois. In exchange, Harris received a demand note from Schuster and a security interest in Schuster's accounts receivables, inventory, and equipment. Relying on its financing from Harris, Schuster submitted purchase orders for five sweepers to Athey during February and March 1992.

Meanwhile, Harris twice extended Schuster's line of credit—once in March and once in May 1992. On June 30, 1992, Harris terminated the line of credit, but only after Schuster paid down over $200,000 of its loan from Harris, using proceeds from sales of the Athey sweepers. Schuster only paid Athey for one sweeper before it filed for bankruptcy on July 13, 1992.

As an unsecured creditor of Schuster, Athey was out over $300,000. Athey filed this action against Harris alleging two theories of common law fraud: (1) Harris' participation in a scheme to defraud; and (2) Harris' knowingly benefiting from a scheme to defraud. After determining that clear and convincing evidence of fraud was lacking, the district court granted Harris summary judgment on Athey's fraud claim. Finding no fraud, the court also granted summary judgment on Athey's unjust enrichment, tortious interference, and deceptive trade practices claims.

Whether evidence of fraud is clear and convincing requires a close examination of the facts, most of which are undisputed. In March 1991, Harris extended an $800,000 line of credit which operated as a revolving loan. Harris advanced funds to Schuster and Schuster directed its customers to send pay-

ments to a lockbox maintained by Harris in Schuster's name. Harris collected these funds, deposited them in a cash collateral account, and applied them to reduce the outstanding balance on Schuster's line of credit.

Schuster's financial condition during this period was not good—its final income statement for the fiscal year ending August 31, 1991, showed a loss of $257,000. Thereafter, Schuster experienced operating losses each month from October 1991 through January 1992. Predictably, on February 24, 1992, Harris notified Schuster that "due to continuing decline in the financial health of [Schuster]," it would not extend the company's $800,000 line of credit past March 20, 1992— the date the loan was up for renewal. Schuster was instructed to contact the bank to arrange to pay off the loan.

Schuster and Harris met on March 6 to discuss Schuster's financial condition and determine a course of action. At this meeting Schuster presented Harris with documents showing bookings of five Athey sweepers: one each to the cities of Austin and Rochester, and three to Ramsey County, all in the state of Minnesota. Prior to the meeting, between February 24 and March 5, Schuster had submitted purchase orders, totaling more than $430,000, to Athey for the five sweepers. From these bookings, Schuster estimated nearly $600,000 in gross sale proceeds. Athey approved Schuster's credit for the purchases and manufactured the sweepers for shipment.

In order to pay Athey for the sweepers, Schuster needed to receive new funds under its line of credit with Harris, which was set to expire on March 20. As a result of its March 6 meeting with Schuster, on March 23 Harris extended Schuster's line of credit to May 31 and continued to provide funds. On May 29, Harris extended Schuster's credit line a second time for 30 more days to June 30.

In April, Athey shipped the two sweepers to Austin and Rochester and two of the three sweepers to Ramsey County. In May, Athey refused to release its certificate of origin for the Rochester sweeper and refused to ship the last Ramsey County sweeper until it received payment from Schuster for the sweeper already shipped to Rochester. On May 7, Schuster paid Athey for the Rochester sweeper, and Athey shipped the third sweeper to Ramsey County on May 22.

A few words about Athey's policy of retaining certificates of origin. In 1991, Athey got burned by some dealers who failed to pay for equipment, leaving Athey with large unpaid debts. Consequently, Athey instituted a new policy of retaining certificates of origin in belief that it would assure payment by its dealers. In this case, because most municipalities were not allowed to make payment for sweepers without clear title, Athey believed that the municipalities would demand the certificates of origin from Schuster before making payment. Thus, Athey believed that Schuster would pay Athey to obtain the certificates of origin before the municipality would pay Schuster.

At the time of the first extension on March 23, Schuster showed a net operating loss of $227,162 for the fiscal year. As of the second extension on May 29, its loss climbed to $386,314. Schuster's deteriorating financial health, however, did not stop Harris' lockbox from filling up with money from Schuster's customers. On May 14 Harris collected payment from Austin for its sweeper. On May 27 Harris collected partial payment from Ramsey County. The remaining payment from Ramsey County was collected on June 8. On June 18 Harris notified Schuster that it was terminating the line of credit as of June 30 and demanded full payment on outstanding sums due by that date. Harris terminated the credit line on June 30, 1992. Schuster filed for Chapter 7 protection in the bankruptcy court on July 13, 1992.

It is undisputed that from March through June 1992, Harris advanced to Schuster more than $1.65 million: $429,000 in March; $320,000 in April; $562,000 in May; and $330,000 in June. From payments to its lockbox, Harris reduced the balance on the line of credit from $634,041 in February to $402,586 in July 1992. Schuster decided how to spend the money advanced to it by Harris. Harris did not control Schuster's use of the funds advanced and did not prevent Schuster from using those funds to pay Athey. Schus-

ter paid Athey and other creditors during this time, with no direction or influence from Harris. In fact, Schuster paid Athey more than $119,000 (for parts, not sweepers) from March through May 1992. Significantly, on several occasions from March through June 1992, Harris permitted the loan balance to rise above the balance on March 20—the date the loan was up for renewal—by advancing more monies.

Athey admits that it did not intend to extend unsecured credit to Schuster and Schuster did not deceive it with respect to the existence of Harris' liens. It had no communication with Harris prior to July 1, 1992. Eventually, Harris recovered all of its credit advances through the two extension periods and liquidation of Schuster's remaining assets. Athey and other suppliers did not receive full payment from Schuster before it filed for bankruptcy.

■ The rules for granting summary judgment and our standard of review are well-known and need not be repeated. This case presents questions of law which we review on a clean slate. The scheme to defraud, as alleged in the complaint, includes: Schuster's representations that it would pay Athey for equipment ordered; that Schuster knew such representations were false because it was insolvent and had insufficient funds with which to pay Athey; Schuster intended that Athey would rely on the misrepresentations; Athey did reasonably rely on the misrepresentations and suffered damages as a result.

■ Under Illinois law, which applies to this case, the elements of common law fraud are: (1) a false statement of material fact; (2) by one who knows or believes it to be false; (3) made with the intent to induce action by another in reliance on the statement; (4) action by the other in reliance on the truthfulness of the statement; and (5) injury to the other resulting from that reliance. *State Security Ins. Co. v. Frank B. Hall & Co.*, 258 Ill.App.3d 588, 196 Ill.Dec. 775, 779, 630 N.E.2d 940, 944 (1994); *see also Indemnified Capital Invs., S.A. v. R.J. O'Brien & Associates, Inc.*, 12 F.3d 1406, 1412 (7th Cir.1993). A litigant alleging fraud under Illinois law bears a heavy burden—proof of intent to defraud by clear and con-

vincing evidence. *State Security*, 196 Ill.Dec. at 778, 630 N.E.2d at 943.

Athey contends first that Schuster misrepresented its ability to pay for the sweepers when it placed the purchase orders knowing it would be unable to pay for them. While we agree with Judge Bucklo's conclusion that whether Athey relied on those orders as representations of Schuster's intent to pay is a question of fact, Athey's misrepresentation claim must fail. Evidence that Athey relied on Schuster's alleged misrepresentation of its intent to pay when it delivered the sweepers does not rise to the level of clear and convincing. Athey's claim of reasonable reliance is substantially undermined by its own conduct—namely its reliance on the certificates of origin to eliminate a known risk of nonpayment. Athey refused to deliver what it thought was the equivalent to good title—the certificates of origin—until it was paid. It believed, to its detriment, that holding on to these certificates would assure payment. Since most municipalities were not allowed to pay for sweepers without clear title, Athey believed its dealer, in this case Schuster, would pay Athey for the certificate of origin before the end user paid the dealer. Unfortunately for Athey that was not the case here, and its claim of fraud is doomed. From our review of the record we cannot say that there is clear and convincing evidence that Schuster committed fraud when it placed the purchase orders.

■ We move next to Athey's contention that Harris committed fraud when it extended Schuster's line of credit only long enough to enable Harris to pay down the balance of its loan. Athey articulates the fraud scheme as Harris' having misrepresented Schuster's financial condition by keeping it alive and creating a false appearance of solvency. Athey alleges that it was in Harris' own interest to keep Schuster as a going concern so it could receive the proceeds from the sale of the sweepers. Athey contends that the only reasonable conclusion is that Harris knowingly extended the line of credit into June solely because the last payment had not been received for the sweepers.

In this instance, speculation, possibilities, and reasonable explanations for Harris' conduct do not satisfy Athey's burden of showing fraud by clear and convincing evidence. Harris offered evidence that it extended the line of credit to allow Schuster time to find alternative financing and that Schuster's president, Marc Olsen, requested the extension. It also offered unrebutted evidence that it permitted the loan balance to rise above the March figure, yet thereafter advanced Schuster money on not one but two occasions, the second coming immediately before terminating the loan in June. It is undisputed that Harris did not tell Schuster how it should spend the funds advanced. Nothing Harris did prevented Schuster from paying Athey. In fact, we have noted that between March and June, Schuster paid Athey over $119,000. Schuster could have paid Athey for the sweepers but it did not. Harris did not control where the advances would go, direct which creditors would be paid, or make other decisions for Schuster. In sum, continuing to advance funds against receivables, permitting the loan balance to increase, and not controlling, directing, or otherwise interfering with Schuster's use of the advances to pay Athey are all actions which fly directly in the face of Athey's contention that Harris masterminded a plan solely aimed at decreasing the balance of the loan at the expense of defrauding Athey.

Since the undisputed evidence would preclude a trier of fact from finding clear and convincing evidence that Harris extended credit to Schuster to maintain it temporarily as a going concern in order to reduce the outstanding balance of the loan at the cost of Athey not receiving payment for the sweepers ordered by Schuster, Harris was properly granted summary judgment on Athey's claim for fraud.

Besides misrepresentation, "[f]raud may also consist of the intentional omission or concealment of a material fact under circumstances creating an opportunity and duty to speak." *Warner v. Lucas*, 185 Ill.App.3d 351, 133 Ill.Dec. 494, 495, 541 N.E.2d 705, 706 (1989). Athey claims that Harris committed fraud by intentionally concealing or omitting material facts regarding Schuster's financial condition. Harris submits that neither a failure to warn Schuster's creditors of its financial condition nor a failure to terminate the loan constitutes an implied misrepresentation or actionable omission because a lender owes no duty to protect third parties from the credit risk of an insolvent borrower. We agree.

Specifically, we have held that making a loan to, and continuing to finance, an insolvent borrower is not a misrepresentation of the debtor's insolvency. *In re EDC, Inc.*, 930 F.2d 1275, 1281 (7th Cir.1991). In that case unsecured creditors alleged that a secured creditor, International Harvester, deceived them and induced their extensions of credit by prolonging the debtor's existence through continued financing, which created the appearance of solvency. We rejected the creditors' theory of fraud, stating:

> At bottom the plaintiffs appear to be arguing that merely by lending money to EDC, Harvester was creating the false impression that EDC was a viable entity.... [W]e have trouble seeing how lending money to a company can be bootstrapped into a misrepresentation. It would be like arguing that a bank becomes liable to the creditors of its borrower if the bank loan could be said to misrepresent the borrower's solvency—a theory of lender liability that would go even further than the one we rejected in *Secon Service System, Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406, 419 (7th Cir.1988), where the bank was alleged to have "project[ed] a false impression that [its borrower] would remain solvent." A projection, prediction, or representation is one thing; a loan is quite another.

*Id.* at 1281. This case is no different. Merely lending money to Schuster, in accordance with its loan agreement, did not create a duty on the part of Harris to warn Athey or other creditors of the risk that Schuster was financially shaky. Nor is Harris' act of lending money to Schuster actionable as a misrepresentation of Schuster's solvency. To hold otherwise would turn the banking industry upside down. Every borrower who experiences financial hardship affecting its ability to pay down its loan would face potential

disaster if its lender were discouraged from advancing further funds by a fear of the prospect of being found liable for a misrepresentation claim by the borrower's unsecured creditors. Athey does not attempt to distinguish this case from *In re EDC* because it cannot. *In re EDC* is controlling here, and for the same reasons advanced there, we reject Athey's claim that Harris misrepresented Schuster's financial condition and deceived Athey by lending money to Schuster and keeping it solvent.

■ Athey also contends that the district court erred by failing to address its second theory of fraud—that Harris is liable because it knowingly benefited from the scheme to defraud. Athey submits that the undisputed facts and reasonable inferences support a finding that Harris knew Schuster was ordering equipment from Athey and other suppliers for which it could not pay. We reject Athey's contention for two basic reasons. First, as we noted, the evidence of a scheme to defraud here does not meet the threshold of clear and convincing evidence. Absent a fraudulent scheme, Harris cannot be said to have benefited from improper conduct. At a minimum, Harris simply benefited from its business decision to finance Schuster in order to obtain proceeds from Schuster's customers to pay down the loan. Second, this situation is typical and not unusual. It simply involves a lender who assumes a significant risk when it decides to extend a line of credit to an insolvent borrower.

■ We move next to Athey's remaining state law claims, which it submits were improperly dismissed on summary judgment. Looking first at the unjust enrichment claim, Athey was required to prove that Harris unjustly retained a benefit to Athey's detriment, and that Harris' retention of that benefit violates fundamental principles of justice, equity, and good conscience. In the absence of clear and convincing evidence of fraud by Harris, we cannot say that Harris unjustly retained a benefit and was thus unjustly enriched. Athey's unjust enrichment claim was properly dismissed. Second, Athey's claim of tortious interference with contract requires a showing that Harris intentionally and maliciously induced Schuster to breach its contract with Athey to pay for the sweepers. Although the standard of proof for this claim is lower—the preponderance of the evidence test—the record is devoid of any evidence which even remotely suggests that Harris intentionally and maliciously induced Schuster's breach. Rather, the evidence affirmatively shows that Harris did not control or influence, directly or indirectly, Schuster's contract with Athey or any of its other creditors. Dismissal of this claim was also proper.

■ Finally, Athey challenges the dismissal of its Illinois Deceptive Practices Act claim. The district court granted summary judgment to Harris because "[t]here is nothing that would comply with the requirements that these trade practices be directed to the market generally or implicate consumer protection concerns." Rather than attempting to demonstrate a consumer nexus, Athey challenges the court's requirement as contrary to the Act (which was amended in 1990) and our decision in *L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561 (7th Cir.1993). Athey argues that this "requirement" was an erroneous reading of Illinois case law because the law is unsettled as to the meaning of conduct "directed to the market generally." The amendment to the Act states that "proof of public injury, a pattern, or an effect on consumers generally" is not required to sustain a claim under the Act. 815 ILCS 505/10a(a) (1995). This amendment was passed to clarify that a plaintiff suing under the Act could state a claim based upon a single, isolated injury, and based solely upon the plaintiff's own injury. *See Rubin v. Marshall Field & Co.*, 232 Ill.App.3d 522, 173 Ill.Dec. 714, 720, 597 N.E.2d 688, 694 (1992). In *Heath*, we found that the 1990 amendment to the Act was to be applied retroactively, but did not decide what type of injury was required to be alleged under the Act. 9 F.3d at 574–75. In diversity cases, we look to Illinois courts' reading of the Act to decide the issue. Although the Illinois Supreme Court has not had occasion to speak to the subject, the intermediate appellate courts have. Those courts and federal district courts in Illinois have uniformly held that claims under the

Act must meet the consumer nexus test by alleging that the conduct involves trade practices directed to the market generally or otherwise implicates consumer protection concerns. *See Lake County Grading Co. v. Advance Mechanical Contractors, Inc.,* 275 Ill.App.3d 452, 211 Ill.Dec. 299, 305–06, 654 N.E.2d 1109, 1115–16 (1995); *Scarsdale Builders, Inc. v. Ryland Group, Inc.,* 911 F.Supp. 337, 340 (N.D.Ill.1996); *Web Communications Group, Inc. v. Gateway 2000, Inc.,* 889 F.Supp. 316, 322 (N.D.Ill.1995). Athey has failed to allege the necessary nexus between the complained of conduct and consumer protection concerns, and therefore summary judgment was properly granted to Harris on Athey's claim under the Deceptive Practices Act.

For these reasons, we AFFIRM the judgment of the district court.